239 N.J. Super. 342 (1990)
571 A.2d 333
HAROLD S. TWISS, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF THE TREASURY, OFFICE OF FINANCIAL MANAGEMENT, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted January 22, 1990.
Decided March 14, 1990.
*343 Before Judges PETRELLA, O'BRIEN and HAVEY.
*344 Falciani & Fletcher, attorneys for appellant (A. John Falciani, on the brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (Michael R. Clancy, Assistant Attorney General, of counsel; Robert P. Krenkowitz, Deputy Attorney General, on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
This appeal presents the latest chapter in the continuing tension between the Right-To-Know Law, N.J.S.A. 47:1A-1 et seq., and requests for information from the State. Directly involved is the validity and effect of a 1963 regulation issued by the State Department of the Treasury, purportedly under the authority of an Executive Order of the then Governor, and the interplay between the Right-To-Know Law and N.J.S.A. 17:9-22 and N.J.S.A. 17:9-25(a). Also involved are successor provisions contained in the Uniform Unclaimed Property Act, N.J.S.A. 46:30B-1 et seq. (sometimes referred to herein as UUPA). We conclude that with respect to custodial property the 1963 regulation violated the Right-To-Know Law and the then extant statute. We also find it inconsistent with the Executive Order and its intent and tenor. Accordingly, we reverse.
Plaintiff Howard S. Twiss instituted an action on May 12, 1987 under the Right-To-Know Law (N.J.S.A. 47:1A-4) to compel the State Treasurer to allow him to inspect records submitted to the State of unclaimed, dormant bank deposits in the protective custody of the State Treasurer under N.J.S.A. 17:9-22 and 17:9-25(a).[1] Twiss sought access to the Treasurer's *345 records under the Right-To-Know Law and the common law right of inspection of public records in order to facilitate his efforts, for a profit, to locate claimants.
The matter came before the trial court on cross-motions for summary judgment. After oral argument on October 14, 1988, the Law Division judge entered judgment in favor of the State and dismissed plaintiff's complaint. Twiss filed his notice of appeal on November 23, 1988.
In denying Twiss's claim of entitlement to inspect the records of unclaimed bank deposits the Treasurer asserted that the records concerning escheat of personal property, including dormant bank deposits, are confidential and protected against indiscriminate public inspection by anyone except the account holder. His justification for refusing to disclose information about the unclaimed bank deposits is premised on a claimed public policy which assertedly disfavors "probate researchers, tracers, genealogists, and heir-hunters," as well as on a claim of privilege between a bank and its customers. He also asserts that the "State has never provided any information concerning unclaimed property to heir-hunters; to do so would only serve as condonation of a violation of the long established public *346 policy condemning heir-hunting." It is undisputed that Twiss is a private party engaged in the business of locating the owners of unclaimed property. When he succeeds in locating such an owner he exacts a fee, usually a percentage of the amount involved.
Twiss asserts that the clear language of N.J.S.A. 17:9-22 and 17:9-25(a), which specifically made the requested records open to public inspection, provided no basis or option for a head of a department to promulgate a regulation or order to the contrary. He argues that the regulation adopted by the State Treasurer on October 1, 1963 must, therefore, be struck down as clearly contrary to the plain, unambiguous meaning of the cited statutes. Twiss also asserts that the power of the executive branch to regulate under the Right-To-Know Law does not include authority to contravene a clear legislative mandate. He further argues that the Treasurer's regulation violates the separation of powers clause of our Constitution (N.J. Const. (1947), Art. III, ¶ 1); is arbitrary and capricious; and there has been no proof of compliance with the Executive Order authorizing the regulation.

I
Up until April 14, 1989 N.J.S.A. 17:9-22 dealt with procedures required of financial institutions for handling bank deposits unclaimed or inactive for 10 years. It stated in pertinent part:
Not later than the thirty-first day of January in each year after the year in which this act takes effect and as of December thirty-first of the preceding year, every bank shall make in duplicate a written report to the State Treasurer containing a true and accurate statement of all unclaimed bank deposits held by the bank as of such date.
Such report shall set forth the name and address of the bank ... and shall list in alphabetical order the name of each person to whose credit an unclaimed bank deposit stands, the last address of the depositor appearing on the records of the bank, the identification number, if any, of each account and the amount to the credit of each account.
* * * * * * * *
Immediately upon receipt of such reports the State Treasurer shall deliver one duplicate of each report to the Attorney General and the State Treasurer shall *347 cause the other duplicate reports to be permanently bound with an alphabetical index of the depositors with appropriate references to the bound reports. Such bound reports and indices shall be open for public inspection during usual business hours and under such reasonable regulations as the State Treasurer shall prescribe. [Emphasis added.]
N.J.S.A. 17:9-25 complemented that section and imposed duties on the State Treasurer. It read in pertinent part:
(a) The State Treasurer shall establish and maintain records of all escheated unclaimed bank deposits received by him, which in the case of deposits with a net balance of fifty dollars ($50.00) or more, shall show in alphabetical order the names of the depositors, the amounts received, the name and address of the bank from which the funds were received, the identification numbers of the accounts if any, and shall establish and maintain an index thereto, which records and index shall at all times during the usual business hours be open to public examination. [Emphasis added.]
After any account had been inactive for 10 years Title 17 (N.J.S.A. 17:9-19)[2] required the bank to mail a notice of unclaimed deposit to the owner of the account, at the last address appearing in the bank's records, prior to August 15 of the year in which the account was to become "unclaimed". This notice was required to state that because there has been no activity in the account for 10 years the amount on deposit would be turned over to the State Treasurer the following January unless the depositor notified the bank. N.J.S.A. 17:9-21(b). Every bank having such an unclaimed deposit was also required to publish the name of the depositor[3] and the name and address of the bank which holds the unclaimed deposit in a newspaper circulating *348 in each county where the bank has an office.[4] This publication was required to appear twice (once in October and once in November). N.J.S.A. 17:9-21(c).[5] Although Title 17 did not preclude inclusion of the depositor's address in the publication, inclusion of the amount was precluded by N.J.S.A. 17:9-21(c). If no claim was received by December 31, the monies and all information regarding the account were turned over to the State Treasurer, less publication costs. N.J.S.A. 17:9-21(b) and 22.6.
The State's position relies on the interplay between the Treasurer's regulation and Executive Order No. 9 signed by then Governor Richard J. Hughes. A brief background discussion is necessary to put this aspect in proper perspective. In 1963 Governor Hughes issued a series of three Executive Orders under the authority of the then recently enacted Right-To-Know Law, L. 1963, c. 73 (N.J.S.A. 47:1A-1 et seq.).
Executive Order No. 7 was promulgated by the Governor on June 21, 1963 and acknowledged that the act provided that "all records which are required by law to be made, maintained or kept on file by State and local governmental agencies are to be deemed to be public records, subject to inspection and examination and available for copying, pursuant to said law." It went on to acknowledge that the "law provides that records which would otherwise be deemed to be public records ... may be excluded therefrom by Executive Order of the Governor or by *349 any regulation promulgated under the authority of any Executive Order of the Governor." That Executive Order then went on to authorize certain agency heads in state and local governments to adopt and promulgate regulations setting forth which records under their jurisdiction shall not be deemed to be public records. It also provided that except for records subject to regulations adopted under the Executive Order, all records required by statute to be made, maintained or kept by any state or local governmental agency were public records.
Because of a perceived need for more time in which to assess the proper implementation of Executive Order No. 7, the Governor promulgated Executive Order No. 8 on August 1, 1963. This Executive Order acknowledged in its preambles: "... The public's right to examine and copy public records, which presently exists under the common law and by statute, remains inviolate even without the benefit of the provisions of Chapter 73, P.L. 1963; ..." and provided that regulations promulgated pursuant to Executive Order No. 7 were not to be deemed effective until October 1, 1963. Significantly, section 3 of this Executive Order stated:
This Executive Order and Executive Order No. 7 shall in no way be interpreted to replace or affect the right that the general public has, by common law, judicial decision, statute or otherwise, to examine and copy public records and shall be limited in its application to the provisions of Chapter 73, P.L. 1963.
On September 30, 1963 Governor Hughes executed Executive Order No. 9, which rescinded the prior two Executive Orders and completed the trilogy of Executive Orders relating to the exceptions to the general rule of applicability of L. 1963, c. 73. In addition to extensive recitals concerning the history of that act and the other Executive Orders, the preambles to Executive Order No. 9, the Order upon which the Treasurer based his regulation, provide in pertinent part:
WHEREAS, Chapter 73 represents a right supplemental to the existing right of the public to examine and copy public records, which right has been established under the common law and by statute and remains inviolate even without the benefit of the provisions of said Chapter 73; and

*350 WHEREAS, Some limitation upon the otherwise unqualified and unrestricted right to examine and copy records provided by Chapter 73 is essential and not detrimental to the public interest since the existing common law and statutory right to examine records remains upon the satisfaction of the requirements imposed by such laws; ... [Emphasis added.]
The Executive Order then went on to require in section 1:
1. All records, other than records set forth in section 3 hereof or records the subject of a regulation adopted and promulgated pursuant to the provisions of section 2 hereof or otherwise excluded under and pursuant to the provisions of Chapter 73, P.L. 1963, which specifically are required by statute to be made, maintained or kept by any State or local governmental agency shall be public records, subject to inspection and examination and available for copying, pursuant to the provisions of Chapter 73, P.L. 1963. All other records of such State and local governmental agencies shall not be deemed to be public records, subject to inspection and examination and available for copying, pursuant to the provisions of Chapter 73, P.L. 1963, but such records shall remain subject to such other provisions of law and regulations as shall be applicable thereto and this provision shall in no way be interpreted as to preclude the appropriate State or local officials from (i) using or making available such records for any of the purposes for which such records are made, maintained or kept or (ii) permitting any person who demonstrates a legitimate reason for wishing to do so to examine such records where such official shall find it is not contrary to the public interest or an undue interference with the operation of the office to permit such an examination. [Emphasis added.]
Section 2 of this Executive Order authorized the heads of principal departments of state government to adopt implementing regulations:
The head or principal executive of each principle department of State government, with respect to the records of his department and any agencies, authorities and commissions assigned or allocated to such department, or under the supervision or regulation of such department, is hereby authorized and empowered to adopt and promulgate, from time to time, regulations setting forth which records under his jurisdiction shall not be deemed to be public records, subject to inspection and examination and available for copying, pursuant to the provisions of Chapter 73, P.L. 1963.
Executive Order No. 9 then went on to list certain types of records which were not to be deemed public records. In general, the referred to records may be characterized as examination questions conducted by state or local government agencies; personnel and pension records; certain vital statistics; fingerprint *351 identifications and criminal records; personal property tax returns and clemency petitions.
Most significantly, section 4 of Executive Order No. 9 stated:
4. This Executive Order shall in no way be interpreted to replace or affect the right that the general public has, by common law, judicial decision, statute or otherwise, to examine and copy public records and shall be limited in its application to the provisions of Chapter 73, P.L. 1963. [Emphasis added.]
On October 1, 1963 then State Treasurer John Kervick adopted a regulation, apparently without prior public notice, expressly providing that all records in the Treasury Department concerning escheat of real and personal property shall not be deemed public records. Paragraphs 4 and 5 of that regulation state:
4. The following records shall not be deemed public records, copies of which may be purchased or reproduced under the provisions of Chapter 73, P.L. 1963:
a. All records which are required to be made, maintained or kept by the Department of the Treasury concerning the Escheat of Real and Personal Property.[6]
5. Any of the foregoing records may be made available for inspection, examination and copying by any individual who demonstrates to the satisfaction of the official custodian of such records that he has a legitimate beneficial interest in the welfare of the individual involved or the protection of his property rights or of any interest the individual may have in any matter affecting him.
The tension between the right to inspect and copy public documents and the need for confidentiality has been the subject of several recent opinions. See, e.g., Techniscan v. Passaic Valley Water Com'n, 218 N.J. Super. 226, 527 A.2d 490 (App. Div. 1987), aff'd as mod. 113 N.J. 233, 549 A.2d 1249 (1988); The Home News Publishing Company v. State, Department of Health, 239 N.J. Super. 172, 570 A.2d 1267 (App.Div. 1990); Asbury Park Press, Inc. v. State of N.J. Dept. of Health, 233 N.J. Super. 375, 558 A.2d 1363 (App.Div. 1989), certif. den. 117 N.J. 646, 569 A.2d 1344 (1989).
*352 Both parties relied in the arguments before the Law Division judge on Accident Index Bureau, Inc. v. Hughes, 83 N.J. Super. 293, 199 A.2d 656 (App.Div. 1964), aff'd 46 N.J. 160, 215 A.2d 529 (1965). The motion judge concluded that the Accident Index case stood for the limited proposition that although first party inspection is permitted, third party inspection is prohibited. The judge then concluded that since the regulation did no more than prohibit third party access it did not discriminate and the adoption of the regulation was an appropriate exercise of discretion.
We are constrained to disagree with the motion judge's interpretation and conclusion. There is no basis for concluding that the word "public" in both N.J.S.A. 17:9-22 and 17:9-25(a) limited disclosure or inspection to just first parties. See Techniscan v. Passaic Valley Water Com'n, supra, 113 N.J. at 236, 549 A.2d 1249. The language of N.J.S.A. 17:9-22 and 17:9-25(a) was so clear and unambiguous in its expression of what was "open to public inspection" that the State Treasurer could not properly adopt a regulation which was contrary to those sections of the statute, and indeed contrary to the language of the Executive Order, and which would effectively result in an implied repeal of the statute. Common law criteria were not involved. Rather, there was a statutory mandate. See McClain v. College Hosp., 99 N.J. 346, 354, 492 A.2d 991 (1985). There was nothing to "deem" to be a public record because those sections of the statute expressly declared what was subject to public disclosure. Moreover, it is clear from the previously recited history of the Executive Orders, as well as their very language, that the Executive Orders never attempted to repeal express provisions of any statute or any common law rights which were not affected by the Right-To-Know Law. Executive Order No. 9 was actually in harmony with prior statutory and case law.
There can be no dispute that neither an Executive Order nor regulation can change or repeal specific statutory authorizations. In Accident Index Bureau, Inc. v. Hughes, supra, 46 *353 N.J. 160, 215 A.2d 529, the Commissioner of Labor and Industry had sought to prevent the Accident Index Bureau (Bureau) from inspecting records of injured workers maintained by the Division of Workers' Compensation. The Bureau was in the business of preparing lists of workers who claimed injuries and were awarded compensation in the past. This information would be provided to prospective employers for a fee. The relevant statute required that these records were to be open to public inspection. The argument against disclosure was that once employers got this information, they could then refuse to hire a worker who was felt to be a malingerer or professional claims collector. The Commissioner promulgated a regulation, also pursuant to Executive Order No. 9, which stated:
The following records shall not be deemed public records, copies of which may be purchased or reproduced under the provisions of Chapter 73, P.L. 1963:
a. All records required by statute to be made, maintained or kept on file pursuant to the provisions of the Workmen's Compensation Law, R.S. 34:15-1 et seq., if the purpose of the inspection or copying is to provide employers with information concerning prospective employees.
We found that regulation invalid and pointed out that it unreasonably discriminated between an employer who seeks the information immediately before the hiring, and one who seeks the information through the same service, immediately after the hiring. 83 N.J. Super. at 300, 199 A.2d 656. Moreover, the regulation prohibited prospective employers from examining these records for the legitimate purpose of selection and placement. Id. at 301, 199 A.2d 656. In affirming, the Supreme Court stated:
The difficulty we have with the regulation in question is that it is not appropriate to the end in mind. At argument the Commissioner conceded the regulation would not bar inspection by an employer himself but rather bars only such inspection by others. Thus, a legitimate interest is frustrated in order to bar the poor behavior of some independent agency. We hesitate to find the Commissioner may thus restrain the legislative mandate of section 59 that `Such records shall be open to the inspection of the public,' in the absence of experience demonstrating that an abuse of that right to inspect cannot be isolated and dealt with directly. A regulation denying access to the records by an independent agency which interferes with the basic objectives of the compensation law described above, with standards suitably expressed to forewarn, *354 would be to the point. Accident Index Bureau, supra (46 N.J. at 165-166 [215 A.2d 529]).
We recognize that in certain contexts heir-hunting or probate-research contracts have been considered to be against public policy. See Bron v. Weintraub, 42 N.J. 87, 95, 199 A.2d 625 (1964) (recognizing hostility toward heir-hunting); International Tracers of America v. Rinier, 139 N.J. Super. 573, 576-577, 354 A.2d 683 (App.Div. 1976) (heir-hunting or probate-research contracts against public policy). Here however, no such public policy is implicated. Nor is the practice of law involved. What is involved are efforts to ascertain the rightful owners of unclaimed deposits. In this sense, what Twiss attempts to do is similar to what banks with unclaimed deposits should do or the State should be obligated to do, except that he charges for his service. This should not preclude efforts by third parties after a bank and the State have not succeeded in locating the owners of unclaimed deposits. There is somewhat of a conflict in the State's incentive to find an unclaimed property owner. The State also may be perceived to have an interest in not trying to find the rightful owner. Under the Title 17 procedures it might have eventually claimed title to the unclaimed deposits. Under the UUPA, the successor statutory scheme, the State does not get title to the property. It acts as a custodian. N.J.S.A. 46:30B-9. See N.J.S.A. 46:30B-61 through 67. Under the UUPA it may retain use of the funds. See N.J.S.A. 46:30B-74 and 75. See also N.J.S.A. 46:30B-69 through 73. However, the State has no interest in the funds superior to the owner of the property and we see no public policy which precludes anyone from attempting to ascertain the rightful owners of the unclaimed deposits, even if it is for a fee, as long as there is no fraud or over-reaching. Thus, in Techniscan v. Passaic Valley Water Com'n, supra, 218 N.J. Super. at 230, 527 A.2d 490, we stated:
We perceive no reason to treat such commercially motivated `citizens' seeking access under the Right to Know Law differently from citizens seeking information for a purely `private' reason or need. Moreover, there is no statutory prerequisite that a person seeking access to a public record, not otherwise *355 protectable, demonstrate that such inspection will result in the protection of the public's interest.
The public policy of the State, as expressed in former N.J.S.A. 17:9-22 and 17:9-25(a), appears counter to the Treasurer's arguments. Those sections declared no confidentiality existed in information concerning unclaimed deposits in the Treasurer's hands. Moreover, recent legislation has arguably promulgated an express public policy contrary to the Treasurer's argument on the status of heir-hunters, albeit subject to certain restrictions. The UUPA recognizes the validity of certain heir-hunter contracts to assist in locating owners of unclaimed personal property. See N.J.S.A. 46:30B-106. Both statutes reflect a public policy of attempting to give notice to restore funds or property to the rightful owner as the first priority.
The Treasurer's reliance on the perceived confidentiality between a bank and its customers loses significance in the context of the custodial escheat laws whose purpose is in part to hold funds for the true owner. If any vestige of confidentiality remains for unclaimed property it is indeed required to be "breached" under the statutes by the publication of the names and last known addresses of owners or "apparent owners" (N.J.S.A. 46:30B-6(b)) of unclaimed monies on deposit (N.J.S.A. 17:9-21(c) prior to April 14, 1989 and N.J.S.A. 46:30B-51 to 53).
The Treasurer's regulation and policy thus runs counter to the intent of custodial escheat type statutes by actually inhibiting location of the true owners and claimants. See Wattles v. Plotts, 230 N.J. Super. 254, 260, 553 A.2d 365 (App.Div. 1989), certif. granted 117 N.J. 68, 563 A.2d 831 (1989).
We hold that under N.J.S.A. 17:9-22 and 17:9-25(a) plaintiff is entitled to inspect all records filed with the Treasurer on or before April 13, 1989.

II
Although our holding is that the UUPA is not to be applied retroactively we recognize that the issue may reoccur *356 under that law. We could reserve this issue for fuller discussion in such an appeal, however, since the State raised the issue some guidance may be useful. Confidentiality was also asserted under the former provisions of Title 17. But the Right-To-Know Law provides in N.J.S.A. 47:1A-2 that:
Except as otherwise provided ... by any other statute ... or ... executive order of the Governor ... or by any regulation promulgated under the authority of any statute or executive order of the Governor, all records which are required by law to be made, maintained or kept on file by any board, body, agency, department, commission or official of the State or of any political subdivision thereof . .. shall, for the purposes of this act, be deemed to be public records. [Emphasis added.]
The initial exceptions to being a public record includes specific reference to other statutes and executive orders. Nevertheless, the sentence is also limited to "for the purposes of this act." We find no legislative intent in the Right-To-Know Law to do anything but preserve the right of inspection authorized by N.J.S.A. 17:9-22 and 17:9-25(a).
As to the effect of the UUPA, we observe that the long established rule in New Jersey is that, generally, statutes should be applied prospectively. Gibbons v. Gibbons, 86 N.J. 515, 521, 432 A.2d 80 (1981); Skulski v. Nolan, 68 N.J. 179, 202, 343 A.2d 721 (1975). However, although this rule is a sound tenet of statutory interpretation, it is not applied mechanistically. Rothman v. Rothman, 65 N.J. 219, 224, 320 A.2d 496 (1974). Retrospective application is allowed when: (1) it is not contrary to constitutional principles; (2) the Legislature clearly provides that a statute is to be applied retrospectively; or (3) the statute is ameliorative or curative. In re Smigelski, 30 N.J. 513, 527, 154 A.2d 1 (1959); Communications Workers of America, AFL-CIO v. Public Employment Relations Com'n, 193 N.J. Super. 658, 663-664, 475 A.2d 656 (App.Div. 1984).
Here, we discern no evidence that the Legislature intended N.J.S.A. 46:30B-1 et seq. to be applied retrospectively or that the new statute is ameliorative or curative. Rather, the committee statement indicates this is a revision of the laws to bring them into harmony with the Uniform Act on the subject. In the *357 absence of an expression regarding retrospectivity or a curative impact with respect to unclaimed bank deposits we conclude that the UUPA is to be applied prospectively. See 2 Sutherland, Statutory Construction, § 41.02 at 247 (4th ed. 1973). Not only were the records sought by plaintiff compiled and filed under Title 17, but the funds were turned over to the State under the provisions of that Title. We therefore consider the provisions of Title 17 to govern records and deposits forwarded to the Treasurer prior to April 14, 1989.

III
The State has argued that N.J.S.A. 46:30B-76.1 provides confidentiality for unclaimed deposits because it states that "[a]ny record or information that is deemed confidential under any New Jersey or federal law when in possession of a person shall continue to be confidential when revealed or delivered to the administrator and shall not be considered a public record under section 2 of P.L. 1963, c. 73 (C.47:1A-2)." As our decision indicates, this provision of the UUPA has no retroactive impact. It only applies on and after April 14, 1989. The State relies before us for the claimed confidentiality of such information solely on Roth v. First Nat'l. State Bank of New Jersey, 169 N.J. Super. 280, 284, 404 A.2d 1182 (App.Div. 1979), certif. den. 81 N.J. 338, 407 A.2d 1212 (1979), a case by a depositor against a bank based on a claim of negligent disclosure by a bank employee who violated bank policy. That case acknowledged that a depositor expects privacy, secrecy and confidentiality as an implicit term of his or her contract with the financial institution, but found no cause of action where the employee, not even involved in the transaction with plaintiff, went beyond the scope of her authority to commit an act referred to as "outrageously criminal and not in any sense in the service of the employer's interests." Id. 169 N.J. Super. at 287, 404 A.2d 1182. The Treasurer extrapolates from such a broad general principle of business confidentiality, expressed in the context of a tort case, to argue:

*358 Since it is well-established that the information regarding a bank account is confidential when held by the bank or financial organization, and since N.J.S.A. 46:30B-76.1 expressly provides that confidential information held by a person shall be confidential when disclosed to the State Treasurer, then the records of the State Treasurer concerning unclaimed bank deposits are confidential and not available for indiscriminate inspection by a third party such as an heir-hunter.
There has been no "well-established" principle of confidentiality demonstrated here as applicable to unclaimed deposits subject to the statute. As noted, Title 17 contained a statutory exception to any such confidentiality for unclaimed deposits. Thus, action by the head of an executive department could not properly negate that legislative enactment. See Worthington v. Fauver, 88 N.J. 183, 197-199, 440 A.2d 1128 (1982).
In any event, in our view the UUPA does not preclude access to information by third parties as to unclaimed deposits, notwithstanding the confidentiality sections (N.J.S.A. 46:30B-76.1 through 76.3), added by amendment to a prior version (S-888 of 1986)[7] of the bill.
It is unclear exactly what type of "confidential information" (N.J.S.A. 46:30B-76.2) the Legislature referred to in its adoption *359 of the confidentiality provision of N.J.S.A. 46:30B-76.1 and what it meant by the term "law" when it said "any New Jersey or federal law." This type of information was not previously confidential for unclaimed deposits. Our attention has not been directed to "any New Jersey or federal law" requiring confidentiality of the names and addresses of bank depositors and N.J.S.A. 46:30B-76 would not only conflict with N.J.S.A. 46:30B-76.1 if this is what it meant, but would itself be internally inconsistent since it requires a record to be made of monies, addresses and annuities and further requires this information to be made available to the public. Moreover, such information on unclaimed deposits was not "confidential" under the prior statutes, N.J.S.A. 17:9-22 and N.J.S.A. 17:9-25(a). Nothing in the UUPA makes it now confidential. We find no legislative intent to the contrary in light of the language of N.J.S.A. 46:30B-76 which continues to mandate that such information shall be "available for the public inspection." Neither our statutory nor case law deems such unclaimed deposit information "confidential," particularly in the context urged by the Treasurer. Indeed, the relationship between a bank and a depositor is considered more akin to that of a debtor-creditor. 5A Michie, Banks and Banking (1983), c. 9, § 1 at 1. "But the relation does not of itself constitute a confidential relation." Id. at 16. Perhaps the Legislature was concerned with an owner's social security number, vital statistics and personal history data, medical information, or tax data when it included N.J.S.A. 46:30B-76.1 in the UUPA.
The United States Supreme Court in U.S. v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), has held that a bank depositor in a Fourth Amendment context has no expectation of privacy in records of his bank accounts subpoenaed by a grand jury. The Court in Miller pointed out that under the Bank Secrecy Act the "expressed purpose ... is to require records to be maintained because they `have a higher degree of usefulness in criminal, tax, and regulatory investigations and proceedings.' 12 U.S.C. § 1829b(a)(1)...." 425 U.S. at 442-443, 96 S.Ct. at *360 1624, 48 L.Ed.2d at 79. Federal law expressly required that those records be kept by federally insured banks. 12 U.S.C. § 1829b(d).
Moreover, any duty of nondisclosure of such information by a bank in this State is of necessity an implied one. See 5A Michie, Banks and Banking, supra, § 1 at 21; 10 Am.Jur.2d, Banks § 332 at 295-296. See also Graney Development Corp. v. Taksen, 92 Misc.2d 764, 400 N.Y.S.2d 717 (Sup.Ct. 1978). In any event, confidentiality would be breached only if information about a depositor or his account was released without the depositor's consent, express or implied. Under the circumstances here involving unclaimed property, we can presume implied consent by the depositor to this disclosure, which would obviously be in the interest of the owner of an unclaimed deposit.
Indeed, the approach taken by the Treasurer would virtually repeal in its entirety N.J.S.A. 46:30B-76, which reads:
Before making any deposit of funds as provided in R.S. 46:30B-74, the administrator shall record the name and last known address of each person appearing from the holder's reports to be entitled to the property and the name and last known address of each insured person or annuitant and beneficiary and with respect to each policy or contract listed in the report of an insurance company, its number, the name of the company, and the amount due. However, the administrator shall not include in this record any information deemed confidential under R.S. 46:30B-76.1. The record shall be available for the public inspection at all reasonable business hours. [Emphasis supplied.]
Under this section the Treasurer must record the name, last known address and the amount due a depositor. This record must be available "for the public inspection at all reasonable business hours." The limitation in this section that the record required to be made "shall not include ... any information deemed confidential under R.S. 46:30B-76.1" surely was not meant to include the required name, address and amount due. In order to read the contemporaneously enacted provisions in harmony, State v. A.N.J., 98 N.J. 421, 424, 487 A.2d 324 (1985); Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 521, 472 A.2d 517 (1984), it appears to us that the Legislature was referring to other types of confidential information expressly *361 made so by the statutory law of this State or the federal government.
The requirement for publication of names and last known addresses of persons listed as owners of unclaimed funds, N.J.S.A. 46:30B-52,[8] as well as the recognition and acceptance of agreements "to locate, deliver, recover or assist in the recovery of property reported under this chapter," N.J.S.A. 46:30B-106, reinforces this view. The public policy of this State with respect to heir-hunters, tracers and the like has now been declared by the Legislature, the policy making branch of government, in L. 1989, c. 58 to allow contracts for compensation to locate owners or claimants to unclaimed property, provided the contract is not entered into within the period one year before and 24 months after the property is paid or delivered to the "administrator," and provided "the fee or compensation agreed upon is not more than 20% of the value of the property recovered." N.J.S.A. 46:30B-106.[9] Moreover, the confidentiality between a depositor and a bank is not absolute and hardly lends support to nondisclosure in such a situation. The State can amply protect itself from potential fraudulent claims by its *362 proof requirements as well as through the criminal statutes. In our view, the overwhelming public interest requires disclosure of the information in the Treasurer's possession.
The UUPA now governs the procedures to be followed when dealing with unclaimed bank deposits reported on or after April 14, 1989. N.J.S.A. 46:30B-18. Since these procedures are generally similar to those required by Title 17, see N.J.S.A. 46:30B-46, -47, -51, -52, the same reasoning applies to records held thereunder.
In view of our determination we need not consider Twiss's arguments under the common law. Cf. McClain v. College Hospital, supra, 99 N.J. 346, 354, 492 A.2d 991; Irval Realty v. Board of Pub. Util. Comm'rs, 61 N.J. 366, 372, 294 A.2d 425 (1972). We likewise need not consider his arguments concerning violation of separation of powers; the claim that the Treasurer's regulation was arbitrary and capricious, and was not published before promulgation; and other ancillary procedural points.
Reversed and remanded. Plaintiff may apply for taxed costs and fees in accordance with N.J.S.A. 47:1A-4.
NOTES
[1] These statutes were repealed by L. 1989, c. 58, effective April 14, 1989, after the appeal was filed in this action (indeed two days after appellant's brief was filed), and replaced with a comprehensive statutory scheme relating to unclaimed personal property known as the "Uniform Unclaimed Property Act (1981)." N.J.S.A. 46:30B-1 et seq. For some unstated reason, perhaps related to the date of the "Uniform Unclaimed Property Act (1981)," promulgated by the National Conference of Commissioners on Uniform State Laws, the title of New Jersey's statute includes the year 1981. See Session Laws, L. 1989, c. 58. Cf. Senate Judiciary Committee Statement to Senate Bill No. 2093 (1989). Unclaimed bank deposits are now governed by Article 6 of this statute. N.J.S.A. 46:30B-18 et seq. For reasons discussed hereinafter, we reject the Treasurer's argument that this statute now governs the appeal, although there is a requirement in the UUPA that the same information "shall be available for the public inspection...." N.J.S.A. 46:30B-76. The records sought by Twiss at the time suit was instituted had all been compiled and filed with the Treasurer under the provisions of Title 17. The funds involved were also turned over to the State under the prior law. The issue is which law applies to records submitted and funds paid over under Title 17 prior to April 14, 1989, the effective date of the UUPA. As hereinafter discussed, generally statutes should not be applied retrospectively unless such an intention is clearly manifested by the Legislature either expressly or implicitly. See discussion infra at 356-357, 571 A.2d at 340, 341. We find nothing to indicate that the statute was meant to be other than prospective.
[2] This provision has been superseded by N.J.S.A. 46:30B-18. Except as otherwise provided, the general time period for other unclaimed personal property is five years. N.J.S.A. 46:30B-7.
[3] It might be questioned under the due process clause whether publishing only the name of the depositor and not the last known address was sufficient notice. See generally Mennonite Board of Missions v. Adams, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Nicoletta v. No. Jersey District Water Supply Com'n, 77 N.J. 145, 390 A.2d 90 (1978). Compare N.J.S.A. 46:30B-52.
[4] Under N.J.S.A. 46:30B-51 and 52 the "administrator" (the Treasurer or his delegate under N.J.S.A. 46:30B-6(a)) must publish comparable information not later than March 1 at least once a week for two successive weeks in an appropriate newspaper of general circulation in the appropriate county.
[5] The UUPA requires publication of the name and last known address (N.J.S.A. 46:30B-52), and does not expressly preclude publication of the amount. But, cf. N.J.S.A. 46:30B-76.1. The new act also requires: "A statement that information concerning the unclaimed property may be obtained by any person having an interest in that property by making a written inquiry to the administrator." N.J.S.A. 46:30B-52(b). The phrase "person having an interest" is not defined in either this section or the definition section, N.J.S.A. 46:30B-6.
[6] Although the Uniform Unclaimed Property Act is a custodial act, we will presume for purposes of this decision that the property would be treated as if subject to "escheat" and the Treasurer's regulation would apply to property held in custody under that act.
[7] The Assembly amendments to S-888 OCR of 1986 contained the following language:

Some amendments conform the bill to many of the current practices of the State Treasurer. For instance, as an accommodation to holders of unclaimed property, the Treasurer currently permits holders to simultaneously deliver the unclaimed property to the Treasurer at the time the holder files its report of unclaimed property with the Treasurer, rather than some period of time after the filing of the report. Both the Treasurer and holders of unclaimed property find this practice to be most efficient and it is therefore incorporated in these amendments (R.S. 46:30B-57). Other amendments amend the construction clause (R.S. 46:30B-2); expand the definition of `administrator' (R.S. 46:30B-6); provide for the preservation of the confidentiality of records that are confidential in the custody of the holder and which are delivered to the Treasurer (R.S. 46:30B-76); and impose limitations upon agreements to find or locate apparent owners of unclaimed property, limitations that are similar to those adopted by other states enacting the uniform act (R.S. 46:30B-106).
[8] The administrator is authorized not to publish items of "less than $50.00 unless the administrator considers their publication to be in the public interest." See N.J.S.A. 46:30B-53.
[9] This section reads in full:

All agreements to pay compensation to locate, deliver, recover, or assist in the recovery of property reported under this chapter, entered into during the period commencing one year before the property was presumed abandoned and extending to a time that is 24 months after the date that the property is paid or delivered to the administrator, are void and unenforceable. Otherwise, these agreements are valid only if the fee or compensation agreed upon is not more than 20% of the value of the property recovered, the agreement is in writing, signed by the apparent owner, and clearly sets forth the nature and value of the property and the value of the apparent owner's share after the fee or compensation has been deducted. However, nothing in this section shall be construed to prevent an owner from asserting at any time that an agreement to locate property is based upon an excessive or unjust consideration.