997 A.2d 262 (2010)
413 N.J. Super. 590
PERTH AMBOY BOARD OF EDUCATION, Appellant,
v.
Chris CHRISTIE, Governor of the State of New Jersey, Respondent.
DOCKET NO. A-3361-09T4
Superior Court of New Jersey, Appellate Division.
Argued May 18, 2010.
Decided June 14, 2010.
*264 Richard E. Shapiro, Cherry Hill, argued the cause for appellant.
Nancy Kaplen, Assistant Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Ms. Kaplen, of counsel; Ms. Kaplen and Michelle Lyn Miller, Senior Deputy Attorney General, on the brief).
Before Judges CARCHMAN, PARRILLO and LIHOTZ.
PER CURIAM.
On February 11, 2010, Governor Christie signed Executive Order 14 (EO14). 42 N.J.R. 660 (March 15, 2010). EO14 characterized the current State fiscal crisis as an emergency and directed the Director of the Division of Budget and Accounting (Director) to withhold State aid to school districts for the remainder of fiscal year (FY) 2010 in an amount equal to the anticipated surplus funds for each district as determined by the Commissioner of the Department of Education (Commissioner). Id. at 661. The executive order provided that if a district needs additional funds to offset the lost State aid for the remainder of school year 2009-2010, it may request that the Commissioner transfer funds from the surplus to the current year's operating costs. Id. at 661, ¶ 6. According to N.J.S.A. 18A:7F-7, part of the Comprehensive Education Improvement and Financing Act, N.J.S.A. 18A:7F-1 to -63 (CEIFA), excess surplus funds are designated to be used for the next year's school budget.
Perth Amboy Board of Education (appellant or Perth Amboy) challenges the executive order as violating constitutional principles of separation of powers, N.J. Const. art. III, ¶ 1, because it conflicts with N.J.S.A. 18A:7F-7. We disagree and hold that EO14 is authorized both statutorily and constitutionally.

I.
The preamble and paragraph 1 of EO14 describe the State's current economic crisis as an "unprecedented" fiscal emergency, in that "actual and anticipated revenue collections by the State continue to fall far below the amounts estimated in the Fiscal Year 2010 Appropriations Act[.]" 42 N.J.R. 660-61. Specifically, the State expects revenue shortfalls of $442 million and $180 million in its sales and corporate business taxes, respectively; a $200 million shortfall in the combined collections of realty transfer and insurance premium taxes; $415 million in previously identified revenue *265 shortfalls; and a $121 million reduction in the estimated beginning balance, resulting in a total projected funding shortfall of $1.333 billion for FY 2010 after taking into account other revenue adjustments. Ibid. Together with the State's additional unanticipated spending needs of $872 million for essential State programs, the estimated budget deficit for the current fiscal year amounts to $2.2 billion. Id. at 661.
To remedy this funding shortfall, EO14 mandates the Director to immediately place into reserve items of appropriation in an amount sufficient to balance the State's budget. Ibid., ¶ 2. Because school aid comprises thirty-five percent of the State's budget for FY 2010, State of New Jersey Office of Management and Budget, Fiscal 2010 Budget in Brief, at 41 (2009), available at http://www.state.nj.us/treasury/omb/ publications/10bib/BIB.pdf, some portion of the funds to be put in reserve were targeted to come from State school aid. Noting in its preamble that "many school districts currently have surplus monies in their budgets that are available but not budgeted that could be made available to support those districts' current expenses during the current period of fiscal emergency[,]"[1] 42 N.J.R. 661, EO14 requires the Director, in consultation with the Commissioner, "to determine the amount of State school aid that must be frozen in order to meet the fiscal emergency." Ibid., ¶ 3.
Upon such an assessment, the Commissioner is to "review the budgets of all school districts" to determine for each district "the amount of unanticipated surplus[2] and reserve account monies" (surplus) available but not yet budgetedthat could be used to support the district's current operating year's (2009-2010) budget in the event of a withholding of State school aid. Ibid., ¶ 4. The Commissioner is directed to "allocate the amount of State school aid determined by the Director to be frozen among all the school districts[,]" provided that the amount "shall not exceed the [s]urplus for each school district or the amount of its remaining State school aid for [FY] 2010." Ibid., ¶ 5. The Director is then instructed to "place into reserve from State school aid for each school district the amount specified by the Commissioner." Ibid.
EO14 also authorizes the Commissioner to grant school districts, upon request, the right to transfer funds from their surplus to their current operating accounts, if necessary "to pay ongoing costs of operation." Ibid., ¶ 6. Significantly, the executive order does not require the transfer of surplus funds but allows such transfers when needed to meet current operating costs.[3] *266 Ibid. It is our understanding that Perth Amboy has not requested any transfers to support operating costs for the current school year.
All State officials are required to cooperate in the implementation of the executive order, and the State Treasurer is to make recommendations and report to the Governor on the fiscal crisis. Ibid., ¶ 7-9. The Governor, in turn, may take additional action if necessary, and the executive order remains in force until supplemented by the Governor or until the FY 2011 Appropriations Act takes effect. Ibid., ¶ 10-11.
Pursuant to EO14, the Director, in consultation with the Commissioner, determined that of the $2.2 billion needed to be placed in reserve to meet the State's funding shortage, $475 million in State school aid would be withheld. The Commissioner allocated that amount to each school district by withholding State aid equal to 100% of the district's excess surplus and twenty-five percent of the district's reserve account balances and under-projected fund balance.
On February 11, 2010, each district was notified by memorandum of the amount of its withholding and the amount of unanticipated surplus and reserve account balances on which the allocation was based.[4] Perth Amboy was advised that, according to Department of Education (Department) records, the district had under-projected its fund balance by $417,945 and had excess surplus of $15,155,778 from the 2008-2009 school year that had not been appropriated for the 2009-2010 budget. This amount was reserved and intended for the 2010-2011 budget, as required by N.J.S.A. 18A:7F-7. Thus, it was determined that out of its total school aid of $124,050,815 and its remaining State aid payments of $42,341,448 for 2009-2010, State aid would be withheld from Perth Amboy in the amount of $15,260,039.
In addition, the February 11 memorandum notified school districts of the opportunity to seek an adjustment to the withholding amount if the district could demonstrate that its actual excess surplus, under-projected fund balance and/or reserve account balances were different than the amounts on which the Department had based the allocations. Perth Amboy appealed its State aid reductions to the Superintendent of Middlesex County, who denied the appeal as beyond his scope of review because it was not premised on an error in the amounts but rather on legal and equitable claims similar to the ones now advanced in this appeal.
On March 24, 2010, Perth Amboy and the City of East Orange School District (East Orange) filed a notice of appeal[5] *267 challenging the withholding of State aid payments as a result of EO14. Appellants allege that the executive order constitutes gubernatorial lawmaking in violation of the constitutional principle of separation of powers because it conflicts with the legislative mandate of N.J.S.A. 18A:7F-7 that excess surplus be appropriated to the school district's subsequent fiscal year's budget. The notice of appeal was accompanied by an emergent application for injunctive relief. We denied the motion but accelerated the appeal and set an expedited briefing schedule given the substantial constitutional issue raised and the urgency for its resolution. Subsequent to entry of our order, East Orange withdrew its appeal.

II.
We first consider the Governor's power to issue EO14. The challenged executive order itself relies on three authoritative sources: (1) the New Jersey Constitution's requirement that the Governor balance the State's budget, N.J. Const. art. VIII, § 2, ¶ 2; (2) statutory budgeting provisions, N.J.S.A. 52:27B-31 and -26, which permit the Governor, under certain circumstances, to freeze funds earmarked for appropriations; and (3) the Disaster Control Act, N.J.S.A. App. A:9-30 to -63(Act), which requires the Governor to take action to protect the safety and welfare of the people of New Jersey in emergency situations. We need not decide the applicability of the latter because we are satisfied that, as a general proposition, there is constitutional and other statutory authority to support the issuance of EO14.
"It is well established that the executive's power to issue an emergency order must stem from an act of the Legislature or from executive authority under the Constitution." Worthington v. Fauver, 88 N.J. 183, 207, 440 A.2d 1128 (1982) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153, 1166 (1952) (federal separation of powers)). As to the latter, "[t]he authority of the Governor of New Jersey derives from Article V of the State Constitution[,]" Bullet Hole, Inc., supra, 335 N.J.Super. at 572, 763 A.2d 295, which states that "[t]he executive power shall be vested in a Governor." N.J. Const. art. V, § 1, ¶ 1. Specifically, the Governor:
shall take care that the laws be faithfully executed. To this end he shall have power, by appropriate action or proceeding in the courts brought in the name of the State, to enforce compliance with any constitutional or legislative mandate, or to restrain violation of any constitutional or legislative power or duty, by any officer, department or agency of the State; but this power shall not be construed to authorize any action or proceeding against the Legislature.
[N.J. Const. art. V, § 1, ¶ 11.]
One method available for the Governor to ensure that the laws are "faithfully executed" is to issue an executive order. See Kenny v. Byrne, 144 N.J.Super. 243, 251, 365 A.2d 211 (App. Div.1976), aff'd o.b., 75 N.J. 458, 383 A.2d 428 (1978). Executive orders are a well accepted tool of gubernatorial action. Bullet Hole, supra, 335 N.J.Super. at 574-75, 763 A.2d 295.
[T]he Governor[,] when he issues proclamations and exercises his ordinance power generally, [and] the administrative agencies[,] when they exercise rule-making power[,] may seem to be exercising legislative power, but such powers, at least in the case of the Governor and the courts, are inherent and essential to the performance of the primary functions for which their offices are created in the Constitution.

*268 [Winberry v. Salisbury, 5 N.J. 240, 252, 74 A.2d 406, cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950).]
Indeed, the 1947 Constitution strengthened the powers of the Governor. Kenny, supra, 144 N.J.Super. at 251, 365 A.2d 211. As to fiscal affairs, "to prevent the Legislature from exercising inordinate power over the other branches of government through its power of the purse, the 1947 Constitution gave the Governor a `vital constitutional role in the budget process[,]'" namely the "statutory power to propose the State budget, and the right to exercise a selective veto over the appropriations." Communications Workers of Am. v. Florio, 130 N.J. 439, 454, 617 A.2d 223 (1992) (citations omitted); see also N.J. Const. art. V, § 1, ¶ 15 (Governor has the power to excise line-item appropriations from the State budget). Correspondingly, the Governor has the constitutional responsibility to ensure that a balanced budget be maintained, N.J. Const. art. VIII, § 2, ¶ 2, namely that appropriations in a fiscal year do not exceed the total and anticipated revenue available for that year. See N.J.S.A. 52:27B-20, -21. In sum, "[t]he members of the Constitutional Convention of 1947 considered the Governor's `significant responsibilities over the State's fiscal affairs' to be an important aspect of the centralization of State finances essential to efficient modern government operations." Communications Workers of Am., supra, 130 N.J. at 454, 617 A.2d 223 (quoting City of Camden v. Byrne, 82 N.J. 133, 150, 411 A.2d 462 (1980)).
In addition, the Legislature, in furtherance of the Executive's constitutional obligation, empowered the Governor to deny certain fiscal appropriations under particular circumstances. For example, N.J.S.A. 52:27B-31 provides that "in the case of extravagance, waste or mismanagement," the Governor may prohibit or enjoin an appropriation that "is not in the best interest of the State[.]" In addition, N.J.S.A. 52:27B-26, enacted in 1944 before adoption of the 1947 State Constitution, provides that in a fiscal emergency the commissioner (now, the Director) may "set aside a reserve out of each appropriation" and determine the exact amount of such reserve. Thus, N.J.S.A. 52:27B-26 provides:
In order to protect against and meet emergencies that may arise during each fiscal year, the commissioner shall have the power to set aside a reserve out of each appropriation, the exact amount of which shall be determined by him. Any time during the fiscal year that occasion may require this reserve or any portion of it may be returned to the appropriation to which it belongs, providing the commissioner finds such action necessary.
Whenever it appears to the satisfaction of the Governor that revenues have fallen seriously below those anticipated, the commissioner, on order of the Governor, shall have the power to revise quarterly allotments.[6]
These constitutional and statutory provisions generally support issuance of EO14. That, however, does not end the inquiry. The New Jersey Constitution vests lawmaking power in the Legislature, N.J. Const. art. IV, § 1, ¶ 1, and while an executive order is entitled to deference, it cannot amend or repeal specific statutory authorizations. Williamson v. Treasurer, 357 N.J.Super. 253, 272, 814 A.2d 1153 (App.Div.), certif. denied, 177 N.J. 493, 828 A.2d 920 (2003); Twiss v. Dep't of Treasury, 239 N.J.Super. 342, 352, 571 A.2d 333 (App.Div.1990), rev'd on other *269 grounds, 124 N.J. 461, 591 A.2d 913 (1991). This is because of the "bedrock principle of our federal and state constitutional forms of governmentthe separation of powers." In re P.L. 2001, 186 N.J. 368, 378, 895 A.2d 1128 (2006). This doctrine, embodied in our State Constitution, provides:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
[N.J. Const. art. III, ¶ 1.]
"The separation of powers is not an end in itself, but a general principle intended to ensure that the system of checks and balances remains vital." State v. Abbati, 99 N.J. 418, 434, 493 A.2d 513 (1985). However, while each branch of government is charged with particular powers, these powers are not meant to be completely distinct and separate from each other. On the contrary, "[t]he separation of powers does not require complete insulation of the branches from each other.... `[It] was never intended to create, and certainly never did create, utterly exclusive spheres of competence.'" Gen. Assembly v. Byrne, 90 N.J. 376, 382, 448 A.2d 438 (1982) (quoting In re Salaries for Prob. Officers of Bergen County, 58 N.J. 422, 425, 278 A.2d 417 (1971)).
In Bullet Hole, supra, we held that when the Governor is "acting consistently with express or implied authority from the Legislature," his or her action should be given "`the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" 335 N.J.Super. at 575, 763 A.2d 295 (quoting Youngstown, supra, 343 U.S. at 637, 72 S.Ct. at 871, 96 L.Ed. at 1200 (Jackson, J., concurring)). Conversely, "`[e]mergency' executive power can be an unconstitutional usurpation of legislative authority either when the executive acts contrary to the expressed or implied will of the Legislature or when the Legislature has failed to act." Worthington, supra, 88 N.J. at 207, 440 A.2d 1128 (citing Youngstown, supra, 343 U.S. at 635-38, 72 S.Ct. at 870-71, 96 L.Ed. at 1199-1200 (Jackson, J., concurring)); see also Communications Workers of Am. v. Christie, 413 N.J.Super. 229, 274, 994 A.2d 545 (App.Div.2010) (slip op. at 62-68, 71-75) (holding that an executive order violated the separation of powers doctrine because it was "fundamentally incompatible" with existing statutory provisions).
Here, as noted, EO14 requires the Director to freeze state aid for the remainder of school year 2009-2010 in the amount that the Commissioner determines is available to each district through excess surplus and reserve funds. 42 N.J.R. 661, ¶ 2-5. If a district needs the withheld funds in order to meet its current expenses, the district may request permission from the Commissioner to transfer funds to that year's operating budget from either reserve accounts (emergency and maintenance) or, if those are not available, from surplus accounts. Ibid., ¶ 6.
No one disputes that aspect of EO14 that incorporates the well-established and statutorily authorized mechanism of having the Director place the necessary appropriated funds in reserve to meet emergencies or seriously falling revenues. N.J.S.A. 52:27B-26. Rather, Perth Amboy principally objects to the executive order's added feature linking the withholding of these funds to the transfer of a school district's excess surplus when necessary and appropriate to support the district's current year budget. Perth Amboy argues that its surplus cannot be utilized to offset the loss of State aid in this year's operating costs, *270 as called for by EO14, without running afoul of N.J.S.A. 18A:7F-7(c), which provides that excess surplusi.e., any unbudgeted surplus in excess of the permitted two percent fund balanceshall be appropriated for the subsequent year's budget. Accordingly, Perth Amboy contends that EO14 contravenes the express intent of the Legislature and is therefore unconstitutional. We disagree.
In determining whether the Governor's executive order violates the separation of powers doctrine, we must consider "whether the order[] represent[s] a usurpation of legislative power by the executive branch...." Worthington, supra, 88 N.J. at 206, 440 A.2d 1128. When discerning the Legislature's intent, courts consider not only the particular statute in question, but also the entire legislative scheme of which it is a part. In re Adoption of a Child by W.P. & M.P., 163 N.J. 158, 168, 748 A.2d 515 (2000). "Sources of legislative intent are the language of a statute, the policy behind a statute, concepts of reasonableness and legislative history." Coletti v. Union County Bd. of Chosen Freeholders, 217 N.J.Super. 31, 35, 524 A.2d 1270 (App.Div.1987).
Some background is in order. The New Jersey Constitution, article VIII, § 4, ¶ 1, directs the Legislature to "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." Recognizing the need for inter-branch cooperative accommodation and the non-exclusivity of the assigned task, the Legislature delegated some of this responsibility to the Commissioner, and the Court has taken an expansive view of the Commissioner's powers. In re Upper Freehold Reg'l Sch. Dist., 86 N.J. 265, 274-75, 430 A.2d 905 (1981). For example, the Commissioner may order changes in a school budget to ensure that thoroughness and efficiency standards are met. Id. at 275, 430 A.2d 905.
In response to the Court's ruling in Abbott v. Burke, 136 N.J. 444, 446-47, 643 A.2d 575 (1994), that the Quality Education Act, N.J.S.A. 18A:7D-1 to -37, was unconstitutional, the Legislature enacted CEIFA. CEIFA established core curriculum content standards (CCCS) to insure that every child in the State would receive a thorough and efficient (T & E) education and also provided detailed rules for school funding through a combination of local tax revenue and state aid.
CEIFA requires the Commissioner to annually inform each district of the maximum amount of aid that will be paid by the State. N.J.S.A. 18A:7F-5. The district must also raise its local share through a general fund tax levy. N.J.S.A. 18A:7F-5(b). Each year, before March 4, the district must submit to the Commissioner a budget for approval. N.J.S.A. 18A:7F-5(c). The budget must include the amount of surplus available "at the beginning of the preceding school year, at the beginning of the current school year and the amount anticipated to be available for the ensuing school year[.]" N.J.S.A. 18A:22-8(a)(2). It must also identify the amount of State aid and the local share which is required to be raised through a tax levy. N.J.S.A. 18A:22-8.
The Commissioner determines whether the budget adequately provides for a T & E education and, if not, may "direct such budgetary reallocations and programmatic adjustments, or take such other measures, as he deems necessary to ensure implementation of the required thoroughness and efficiency standards." N.J.S.A. 18A:7F-6(a).
In 1998, CEIFA was amended to include permissible amounts of reserves that a district could maintain and directions for *271 disposal of amounts that exceeded the statutorily mandated reserves. N.J.S.A. 18A:7F-7(a); L. 1998, c. 55, § 3. If a district had an undesignated general fund balance that exceeded a specific percentage of the district's budget, that balance had to be appropriated for the following year's budget. N.J.S.A. 18A:7F-7(c); L. 1998, c. 55, § 3. However, if the district wished to expand, renovate or construct school facilities, or make other major capital improvements, the excess undesignated general fund balance could be transferred to a capital reserve account with the approval of the Commissioner. N.J.S.A. 18A:7F-7(b); L. 1998, c. 55, § 3.
Introduced as Senate Bill 1701 (S1701) and Assembly Bill 99(A99), L. 2004, c. 73 (Chapter 73) further amended CEIFA. Before submission of a school budget for the Commissioner's approval, the county superintendent may examine the budget for administrative inefficiencies. N.J.S.A. 18A:7F-5(c); L. 2004, c. 73, § 1. In addition, the percentages permitted to be maintained as surplus were lowered for the 2004-2005 school year. N.J.S.A. 18A:7F-7(a); L. 2004, c. 73, § 3. Also, any appropriation to, among other things, a capital reserve account made following the April 2004 school budget election and prior to the effective date of Chapter 73 would be null and void unless the district could demonstrate to the Commissioner that the expenditure was necessary for use in the 2003-2004 year to meet T & E standards and no other source of funds were available. Ibid.
In 2005-2006 and thereafter, Chapter 73 provided for a further reduction in the percentage permitted to be maintained in reserves by the district. Ibid. The Legislature specified that excess surplus funds made available because of the reduction in the percentage of an authorized undesignated general fund balance (i.e., the difference between the prior three percent and the current two percent allowances) had to be used to reduce the general fund tax levy for that budget year. Ibid. Any amounts that exceeded the general fund balance at June 30 of a school year would be appropriated for the subsequent year's budget. N.J.S.A. 18A:7F-7(c); L. 2004, c. 73, § 3.
The committee statement to S1701 acknowledged that the Commissioner may approve transfers from surplus funds to operating costs after the first nine months of the school year, in order to implement CCCS, and prior to April 1 when emergent circumstances exist.[7]Senate Budget and Appropriations Committee, Statement to Senate Committee Substitute for Senate No. 1701, at 3 (June 17, 2004). This concept was incorporated in N.J.S.A. 18A:22-8.1, the transfer of funds provision, which states in relevant part:
Transfers of surplus amounts or any other unbudgeted or underbudgeted revenue to line items and program categories shall require the approval of the Commissioner of Education and shall only be approved between April 1 and June 30 for line items and program categories necessary to achieve the thoroughness standards established pursuant to section 4 of P.L. 2007, c. 260 (C.18A:7F-46); except that upon a two-thirds affirmative vote of the authorized membership of a board of education, the board may petition the commissioner for authority to transfer such revenue prior to April 1 due to an emergent circumstance and the commissioner may authorize the transfer if he determines *272 that the transfer is necessary to meet such emergency.
See also N.J.A.C. 6A:23A-13.3 (discussing transfers during the budget year).
N.J.S.A. 18A:7F-7, in its current form, determines how a district calculates its surplus and how the surplus may be utilized. In 2004-2005, a district was allowed to maintain a reserve balance of three percent of its budget or $100,000, whichever was greater, while the excess surplus was appropriated for the succeeding year's budget. N.J.S.A. 18A:7F-7(a). In 2005-2006 and thereafter, the permitted reserve was changed to the greater of two percent of the budget or $250,000. N.J.S.A. 18A:7F-7(a). However, with the Commissioner's approval, a district is still allowed to appropriate its excess surplus to a capital reserve account to fund long-range facilities plans. N.J.S.A. 18A:7F-7(b).
Under this statutory scheme, the Commissioner is granted broad powers to direct expenditures to meet T & E requirements as well as to address emergency circumstances. See N.J.S.A. 18A:22-8.1; N.J.S.A. 18A:7F-6(a). The Legislature clearly contemplated that situations may arise whereby a district will need to use its excess surplus for matters other than the next year's operating budget. In such cases, as embodied in N.J.S.A. 18A:22-8.1, the Commissioner has the power to approve the transfer of those funds to operating costs for the current school year to ensure that a school district provides a T & E education. This authorization belies the hard and fast rule, advocated by appellant, that a school district must have its excess surplus applied to the subsequent year's operating budget. In our view, the legislative intent of N.J.S.A. 18A:7F-7, which limits a district's use of excess surplus during the current school year and requires Commissioner approval for any other use, is not to restrict the Commissioner and the Director from approving the transfer of such funds to current operating costs to ensure that T & E standards are maintained.
Perth Amboy nevertheless complains that it should not be put to the Hobson's choice of either reducing spending by approximately $15 million for the remainder of the 2009-2010 school year or using the excess surplus and other reserves to fund expenditures in this school year and therefore reduce spending for necessary items in 2010-2011. But, appellant has not shown that it will be unable to meet its obligation to provide a T & E education this year if the State withholds aid, or that it will not have adequate funding next school year to provide a T & E education. To the contrary, Perth Amboy has not sought approval under EO14 for the transfer of funds from excess surplus to operating costs. Indeed, EO14 does not require that the excess surplus be used. A school district may have sufficient resources without transferring excess surplus to support its current operating budget. If not, other reserve funds may be considered, and the district may review its budget for potential efficiencies.
We conclude that in issuing EO14, the Governor acted pursuant to constitutional and statutory authority and, consequently, not in violation of the separation of powers doctrine or in derogation of the Legislature's will.
Affirmed.
NOTES
[1] The budget for the upcoming school year is prepared and adopted prior to the end of the current school year, and the actual amount of surplus the district will have at the end of the current school year must be projected. Because the budget must be submitted by March 4, N.J.S.A. 18A:7F-5(c), any excess surplus balance as of June 30 would be appropriated in the budget submitted the following March. N.J.S.A. 18A:7F-7(c). Thus, excess surplus from the 2008-2009 school year would be included in the budget submitted on March 4, 2010 for the 2010-2011 school year. The surplus in issue here was established based on the 2007-2008 school year.
[2] As used in EO14, "unanticipated surplus" includes two components derived from the district's annual audit conducted pursuant to N.J.S.A. 18A:23-1. First, it includes any increase between the district's March 2009 projection of its ending fund balance and its audited fund balance of up to two percent, i.e., the "under-projected fund balance." Second, it includes the amount of audited surplus that exceeds the permitted fund balance, i.e., "excess surplus."
[3] On February 25, 2010, districts were provided with guidance regarding requests for transfers from unanticipated surplus and/or reserve accounts. Initially, the district must review current budget line item balances to determine if any line items have unexpended funds that could be transferred to other line items. Second, the district should then look to transfer funds from the maintenance reserve account for maintenance expenditures, N.J.A.C. 6A:23A-14.2, and the emergency reserve account, N.J.A.C. 6A:23A-14.4. Only in the event that additional funds are needed to support its operational costs after these transfers are accomplished may a district request transfers from its fund balance or its excess surplus.
[4] In making these decisions, the Commissioner considered excess surplus, emergency reserves, maintenance reserves and capital reserve accounts. See N.J.S.A. 18A:7F-41. Balances in the debt service reserve account, N.J.S.A. 18A:7F-41(c)(2), were not included.
[5] Rule 2:2-3(a)(2) provides that final decisions of any state administrative agency or officer are appealable as of right to the Appellate Division, and the rule has been held to apply to gubernatorial actions inasmuch as the Governor is the State's chief executive officer. Bullet Hole, Inc. v. Dunbar, 335 N.J.Super. 562, 571-72, 763 A.2d 295 (App. Div.2000).
[6] Allotments, however, are no longer made quarterly.
[7] The Assembly Appropriations Committee issued an identical statement. Assembly Appropriations Committee, Statement to Assembly Committee Substitute for Assembly No. 99, at 3 (June 17, 2004).