994 A.2d 545 (2010)
413 N.J. Super. 229
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO; New Jersey Public Employees Council 1 of the American Federation of State, County and Municipal Employees, AFL-CIO; The International Federation of Professional and Technical Employees, AFL-CIO, Local 195; and American Federation of Teachers, AFL-CIO-New Jersey, Appellants,
v.
Chris CHRISTIE, Governor of the State of New Jersey, Respondent.
New Jersey Education Association, Appellant,
v.
Chris Christie, Governor of the State of New Jersey, Respondent.
New Jersey State Policemen's Benevolent Association, Appellant,
v.
Chris Christie, Governor of the State of New Jersey, Respondent.
DOCKET NO. A-2871-09T2, A-2996-09T2, A-2997-09T2.
Superior Court of New Jersey, Appellate Division.
Argued April 8, 2010.
Decided May 7, 2010.
*547 Steven P. Weissman, New York, NY, argued the cause for appellant Communications Workers of America, AFL-CIO, in A-2871-09 (Weissman & Mintz, L.L.C., and Laurence E. Gold, Washington, DC, of the Washington, D.C. bar, admitted pro hac vice, attorneys; Mr. Gold, Mr. Weissman, Annmarie Pinarski, Somerset, and Meredith Richardson, Kittery, ME, on the joint brief).
Zazzalli, Fagella, Nowak, Kleinbaum & Friedman, attorneys for appellant New Jersey Public Employees, Council 1 of the American Federal of State, County and Municipal Employees, AFL-CIO in A-2871-09 (Sidney H. Lehmann, on the joint brief).
*548 Oxfeld Cohen, P.C., attorneys for appellant The International Federation of Professional and Technical Employees, AFL-CIO, Local 195 in A-2871-09 (Arnold Shep Cohen, Newark, on the joint brief).
Leon B. Savetsky argued the cause for appellant American Federation of Teachers, AFL-CIO-New Jersey in A-2871-09 (Loccke, Correia, Schlager, Limsky & Bukosky, attorneys; Mr. Savetsky, on the joint brief).
Richard A. Friedman argued the cause for appellant New Jersey Education Association in A-2996-09 (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Mr. Friedman, Robert A. Fagella, Edward M. Suarez, Jr., Newark, and Marissa A. McAleer, of counsel and on the brief).
Robert A. Fagella argued the cause for appellant New Jersey State Policemen's Benevolent Association in A-2997-09 (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; Mr. Fagella and Paul L. Kleinbaum, of counsel; Mr. Fagella, Mr. Kleinbaum, Edward M. Suarez, Jr., Newark, and Marissa A. McAleer, on the brief).
Stephen J. Edelstein, Morristown, argued the cause for respondent (Schwartz Simon Edelstein Celso & Zitomer, L.L.C., attorneys; Mr. Edelstein, of counsel and on the brief).
Law Offices of John W. Hartmann, attorneys for amicus curiae John W. Hartmann (Mr. Hartmann, on the brief).
Judges STERN, SABATINO and J.N. HARRIS.
PER CURIAM.
On January 20, 2010, Governor Chris Christie issued Executive Order Number 7 ("EO 7" or "the executive order"), which attempts to extend to labor unions and labor organizations certain "pay-to-play" restrictions on political campaign contributions. The full text of EO 7 reads as follows:
WHEREAS, it is the clear and express intent of this Administration that all individuals who are elected to or otherwise hold public office shall adhere to the highest ethical standards; and
WHEREAS, prior actions of the New Jersey Legislature and existing Executive Orders have imposed stringent requirements on those individuals who hold public positions; and
WHEREAS, since 2004, there have been a series of legislative and executive actions which have imposed restrictions on the campaign contributions of those who contract with the State of New Jersey and other public entities, so as to avoid actual conflicts of interest or even the appearance of conflicts of interest in the public contracting process; and
WHEREAS, even though these "pay-to-play" restrictions have had a positive impact on the public contracting process, they have not extended their reach to all "business entities" which contract with the State of New Jersey and other public entities; and
WHEREAS, even though contributions in excess of the amount identified in legislation, Executive Orders, and regulations are restricted to many forms of political and campaign committees, these restrictions have not extended their reach to all such committees;
NOW, THEREFORE, I, CHRIS CHRISTIE, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and by the Statutes of this State do hereby ORDER, and DIRECT:
1. Prior Executive Orders implementing "pay-to-play" restrictions are hereby modified to include within the definition of the term "Business Entity" any Labor Union or Labor Organization which enters *549 into contracts with the State of New Jersey and its instrumentalities or with other New Jersey public entities. The reference in this Executive Order to "labor unions" and "labor organizations" shall include any political committee formed by any such labor union or labor organization, one of the purposes of which political committee is to make political contributions. All Department and Agency heads are directed to revise current regulations to be consistent with this change.
2. Prior Executive Orders implementing "pay-to-play" restrictions are hereby modified to include Legislative Leadership Committees within the list of committees and depositories as to which the contribution restrictions are applicable. All Department and Agency heads are directed to revise current regulations to be consistent with this change.
3. This Order shall take effect immediately.
[42 N.J.R. 580(b).]
Appellants, six labor unions that are the duly-elected representatives of more than 300,000 public employees, have brought this consolidated emergent appeal, alleging that EO 7 is unconstitutional in numerous respects. In particular, appellants contend that EO 7 conflicts with the terms of existing legislation and thereby infringes upon principles of separation of powers, in violation of article III, paragraph 1, of the New Jersey Constitution. Appellants further argue that EO 7 transgresses their rights of free speech, political association, and equal protection under the Federal and State Constitutions. They seek immediate injunctive relief so that they can exercise their rights of political participation without fear of some form of debarment or disqualification.
The Governor maintains that EO 7 represents the lawful exercise of his constitutional powers. He asserts that EO 7 simply extends the provisions of pay-to-play executive orders that were issued by his two immediate predecessors in office, and that EO 7 serves legitimate public purposes that can be harmonized with existing statutes.
Because we conclude, for the reasons explained in this opinion, that paragraph 1 of EO 7 violates principles of separation of powers, we invalidate it to the extent that it is written or intended to be construed to cover labor unions and collective bargaining[1] agreements. We do so without prejudice to the potential adoption of an appropriate statute that might enact pay-to-play reforms covering labor organizations, but in a manner consistent with existing statutes or which explicitly amends those existing laws.

I.
EO 7 follows a series of statutes and gubernatorial executive orders generated over the past six years, which have been focused upon restricting the actual or perceived impact of political campaign contributions upon governmental procurement decisions. As we noted in In re Earle Asphalt Co., 401 N.J.Super. 310, 321, 950 A.2d 918 (App.Div.2008), aff'd o.b., 198 N.J. 143, 966 A.2d 460 (2009), there is a "strong governmental interest in limiting political contributions by businesses that contract with the State[.]" That strong governmental interest has been recognized by both the Legislative and Executive *550 Branches of our State Government. See N.J.S.A. 19:44A-20.13; 36 N.J.R. 4562(b).
As N.J.S.A. 19:44A-20.13 declares, "[w]hen a person or business interest makes or solicits major contributions to obtain a contract awarded by a government agency or independent authority, this constitutes a violation of the public's trust in government and raises legitimate public concerns about whether the contract has been awarded on the basis of merit[.]" Ibid. "It is essential that the public have confidence that the selection of State contractors is based on merit and not on political contributions made by such contractors[.]" Ibid. Likewise, "it is essential that the public have trust in the processes by which taxpayer dollars are spent[.]" Ibid.
The concept of pay-to-play has been described as "the political practice of rewarding campaign contributors with no-bid government contracts." Paula A. Franzese & Daniel J. O'Hern, Sr., Restoring the Public Trust: An Agenda For Ethics Reform of State Government and a Proposed Model for New Jersey, 57 Rutgers L.Rev. 1175, 1222 (2005). The evil arises when prospective vendors "pay" contributions to candidates for public office, or to their affiliated political organizations, in order to "play" for (i.e., be awarded or favorably considered in the award of) government contracts when those candidates take or retain public office.
Even though various ethics laws, procurement laws, and criminal laws already forbid the making of political contributions as a quid pro quo for receiving a government contract, a frequent problem in establishing the violation of those laws is "proving the connection between the contributions and the contract." Ibid. Consequently, pay-to-play provisions (perhaps more accurately described as "anti-pay-to-play" provisions) typically "prohibit the participation in the public contracting field of campaign contributors whose donations exceed certain minimum levels." Ibid.
To address these concerns over pay-to-play practices, a succession of statutes and executive orders were promulgated in our State between 2004 and 2008, preceding the issuance of EO 7 in January 2010.[2] Because EO 7, by its own terms, is couched as an effort to build upon those prior enactments, and because the historical context bears upon our analysis of the issues before us, we discuss those prior enactments in some detail.

A.
The first set of pay-to-play restrictions were enacted by the Legislature on June 10, 2004, and signed into law by former Governor McGreevey less than a week later on June 16, 2004. See L. 2004, c. 19. That statute, now commonly referred to as "Chapter 19," was entitled "An Act Concerning Certain Campaign Contributions By Certain Business Entities and County Political Party Committees[.]" Ibid.; see also Assemb. B. 2, 211th Leg. Sess. (2004) (utilizing that title); S.B. 2, 211th Leg. Sess. (2004) (same). The statute expressly indicated that it was "supplementing [L.] 1973, c. 83 [N.J.S.A. 19:44A-1 to -26], and amending [L.] 1973, c. 83 [N.J.S.A. 19:44A-1 to -26]." L. 2004, c. 19 (emphasis added).
The New Jersey Campaign Contributions and Expenditures Reporting Act, L. 1973, c. 83 ("Chapter 83"), N.J.S.A. *551 19:44A-1 to -26, which Chapter 19 literally "supplemented" and "amended," covers a wide scope of matters dealing with political campaign contributions, expenditures, and reporting. Chapter 83 includes several requirements that place ceilings[3] upon political contributions that can be lawfully made by various enumerated categories of donors.
The donors that are subject to Chapter 83's contribution limits specifically include, among other categories, a "labor organization of any kind which exists or is constituted for the purpose, in whole or in part, of collective bargaining, or of dealing with employers concerning the grievances, terms or conditions of employment, or of other mutual aid or protection in connection with employment[.]" See N.J.S.A. 19:44A-11.3(a) (containing this reference to labor organizations); N.J.S.A. 19:44A-11.4(a), (b), & (c) (same). When the Legislature amended Chapter 83 in 2002 to impose further restrictions upon donations to certain political committees, it repeated the same explicit language encompassing labor organizations. See L. 2001, c. 384, § 3; N.J.S.A. 19:44A-11.5(c).

B.
As initially enacted, Chapter 19 injected pay-to-play restrictions into the statutory scheme by limiting the political donations payable by prospective government contractors. The law, in its original form, disallowed a "business entity," a term specifically defined within the new statute, see N.J.S.A. 19:44A-20.7, to obtain no-bid government contracts with an anticipated value above $17,500 from any state, county, or municipal agency, in circumstances where the business entity had made a political contribution above a defined monetary threshold to an elected official or to a political party at the state, county, or municipal level. See N.J.S.A. 19:44A-20.3 to -20.12.[4] As a sign that the Legislature recognized the impact these new restrictions would cause when they were superimposed upon existing statutes, it explicitly stated, in several places, that Chapter 19's provisions were being enacted "[n]otwithstanding the provisions of any other law to the contrary." See L. 2004, c. 19, §§ 1-4; N.J.S.A. 19:44A-20.3 to -20.5.
Chapter 19 originally included an exemption for contracts awarded pursuant to a "fair and open process." N.J.S.A. *552 19:44A-20.3. This exemption pertained to contracts that were publicly advertised; provided for public solicitations; awarded according to set written criteria; and publicly announced when awarded. N.J.S.A. 19:44A-20.7 (defining a "fair and open process").
As defined in Chapter 19, a "business entity" subject to its restrictions is:
any natural or legal person, business corporation, professional services corporation, limited liability company, partnership, limited partnership, business trust, association or any other legal commercial entity organized under the laws of this State or of any other state or foreign jurisdiction.
[N.J.S.A. 19:44A-20.7 (emphasis added).]
The detailed legislative statement accompanying Chapter 19, as recited in both the Assembly version of the bill and the Senate version, commented that the purpose of the new law was to
reduce the risk of actual or perceived corruption which may result when public contracts are awarded to business entities that have contributed to elected officials having control, or apparent control, over the awarding of those contracts, or to political party committees at various levels of government that may have influence over the officials responsible for awarding such contracts, a practice commonly referred to as "pay-to-play."
[Assemb. B. 2, 211th Leg. Sess. (2004) (Sponsor's Statement); S.B. 2, 211th Leg. Sess. (2004) (Sponsor's Statement).]
The effective date of Chapter 19 designated by the Legislature was to be eighteen months in the future, January 1, 2006. L. 2004, c. 19, § 15.

C.
Three months after the enactment of Chapter 19, Governor McGreevey signed Executive Order 134 ("EO 134"), on September 22, 2004. See 36 N.J.R. 4562(b) (Oct. 18, 2004). EO 134 generally attempted to strengthen certain aspects of Chapter 19 as it related to State contracts, and to accelerate the implementation of pay-to-play restrictions.
In particular, EO 134 sought to extend the reach of pay-to-play restrictions by covering all contracts above $17,500 in value entered into by the State or by "any of its purchasing agents or agencies or those of its independent authorities," implicitly including State contracts subject to a "fair and open process" that were otherwise exempted from Chapter 19. Id. at 4563, ¶¶ 1-2. EO 134 was confined to State procurement, and did not cover procurement by county or municipal governments. The executive order utilized the identical definition of a "business entity" contained in Chapter 19. Id. at 4563, ¶ 4. Like Chapter 19, EO 134 made no reference to labor unions, labor organizations, or collective bargaining.
The preamble of EO 134 reaffirmed the State's compelling interest in protecting the integrity of government by refraining from awarding contracts to business entities because they are contributors to political candidates and holders of public office. Id. at 4562-63. Focusing upon the State's important role in procurement decisions, the preamble to EO 134 underscored that "in the procurement process, our public policy grants to the State broad discretion, taking into consideration all factors, to award a contract to a bidder whose proposal will be most advantageous to the State[.]" Id. at 4563 (emphasis added).
As a further indication of its procurement focus, EO 134 contains numerous *553 references to public bidding terminology, directing that:
Every contract and bid application and specifications promulgated in connection therewith covered by this Order shall contain a provision describing the requirements of this Order and a statement that compliance with this Order shall be a material term and condition of said contract and/or bid application and binding upon the parties thereto upon the entry of all applicable contracts.
[Id. at 4564, ¶ 11 (emphasis added).]
In that same procurement-oriented vein, EO 134 instructed that "[p]rior to awarding any contract or agreement to procure services or any material, supplies or equipment from, or for the acquisition, sale, or lease of any land or building from or to, any business entity," that State purchasing agencies require, "as part of the procurement process," each such business entity to report all political contributions it made during the preceding four years to specified political organizations. Id. at 4563, ¶ 5 (emphasis added). See also id. at 4563, ¶ 6 (likewise referring to contracts or agreements "to procure services, or any material, supplies or equipment[,]" or pertaining to the sale or lease of land or buildings).
Paragraph 13 of EO 134 stated that it "shall take effect October 15, 2004, and is intended to have prospective effect only." Id. at 4564, ¶ 13. This effective date, less than a month after EO 134's issuance, was substantially sooner than the effective date of January 1, 2006 chosen by the Legislature for activating the pay-to-play restrictions of Chapter 19.
EO 134 further sought to regulate contracts made with the Executive Branch when a contribution was made to a county, as opposed to a statewide, political committee. Id. at 4563, ¶¶ 1 & 2. It also expanded the time period in which a covered business entity was barred from contributing to a Governor, a candidate for Governor, a State political party committee or a county political committee, to eighteen months before the commencement of negotiations for a contract. Compare L. 2004, c. 19, §§ 1-2 with 36 N.J.R. 4563, ¶ 1.[5]

D.
On October 15, 2004, the nonpartisan Office of Legislative Services ("OLS") issued an opinion that EO 134 was constitutionally invalid. The OLS opinion concluded that EO 134 usurped legislative powers in several respects, in particular by changing the effective date of Chapter 19, by including contracts that were subject to a "fair and open process" within the pay-to-play restrictions, and by expanding the types of political committees that were covered.
Following the OLS opinion casting doubt upon EO 134's constitutional validity,[6] Assembly Bill A-1500 and Senate Bill S-2052 were introduced in October and November 2004. These companion bills, both expressly "modeled on" EO 134, were ultimately enacted as L. 2005, c. 51 ("Chapter 51"), and signed into law by Acting Governor Codey on March 22, 2005. Chapter 51 is mainly codified at N.J.S.A. 19:44A-20.13 to -20.25, appearing right after *554 most of the provisions earlier adopted in Chapter 19, N.J.S.A. 19:44A-20.3 to -20.12.
Like both Chapter 19 and EO 134 which preceded it, Chapter 51 seeks to thwart pay-to-play activities that can improperly influence government procurement decisions. See also Earle Asphalt, supra, 401 N.J.Super. at 321-23, 950 A.2d 918. The preamble to Chapter 51 expressing the Legislature's findings and declarations of policy, N.J.S.A. 19:44A-20.13, is derived substantially  at times verbatim  from the preamble to EO 134.[7] The statutory preamble replicates EO 134's multiple references to "procurement" and to procurement-related concepts such as "the selection of State contractors," and the "award" of a contract to a "bidder." N.J.S.A. 19:44A-20.13. Neither the text nor the preamble of Chapter 51 makes any references to labor unions, labor organizations, or collective bargaining.
Chapter 51 amended and supplemented several aspects of Chapter 19 with respect to contracts awarded within the Executive Branch of State government. In particular, Chapter 51 repealed and superseded Chapter 19's provisions applicable to contracts awarded by State agencies within the Executive Branch. See L. 2005, c. 51, § 16 (repealing N.J.S.A. 19:44A-20.2) & §§ 14-15 (eliminating references to the Executive Branch from N.J.S.A. 19:44A-20.7 and -20.8). Chapter 51 left undisturbed Chapter 19's pay-to-play restrictions for vendor contracts with a State agency within the Legislative Branch, N.J.S.A. 19:44A-20.3, contracts with county governments, N.J.S.A. 19:44A-20.4, and municipal contracts, N.J.S.A. 19:44A-20.5.
Substantively, Chapter 51 eliminated Chapter 19's exemption for State contracts with Executive Branch agencies entered into pursuant to a "fair and open process," as defined in N.J.S.A. 19:44A-20.7.[8] Chapter 51 instead places within its scope State contracts that "procure from any business entity services or any material, supplies or equipment, or [which are entered into] to acquire, sell, or lease any land or building." N.J.S.A. 19:44A-20.14. In situations of public exigency, the statute does provide an exemption for contracts requiring the immediate delivery of goods or the performance of services. N.J.S.A. 19:44A-20.22.
Furthermore, Chapter 51 expanded the pertinent definition of "business entity" by adding: all principals who own or control more than 10% of the profits, assets, or stock of a business entity; any subsidiaries *555 of the business entity; any political organizations controlled by the business entity; and, if the business entity is a natural person, that person's spouse or child residing with him or her. N.J.S.A. 19:44A-20.17.
Largely tracking the structure and text of EO 134, the operative provisions of Chapter 51 repeatedly invoke the nomenclature of procurement and of public bidding. For instance, one section refers to "purchasing agents or agencies," and contracts "to procure" services, material, supplies, or equipment. N.J.S.A. 19:44A-20.14. Another requires, "as part of the procurement process," the reporting of political contributions "[p]rior to awarding any contract or agreement to procure services or any material, supplies or equipment[.]" N.J.S.A. 19:44A-20.18. A third section requires "[e]very contract and bid application and specifications promulgated in connection therewith" to contain a provision describing Chapter 51's pay-to-play requirements, stating that compliance with the statute "shall be a material term and condition of said contract or bid application and binding upon the parties thereto[.]" N.J.S.A. 19:44A-20.24. And, as part of the statute's remedial measures, Chapter 51 declares it "a breach of the terms of the government contract" for a business entity to make or solicit a contribution in violation of the statute. N.J.S.A. 19:44A-20.21.
Again exhibiting the interplay between the newly-codified pay-to-play laws and other pre-existing laws and statutes, the Legislature ultimately included a proviso in Chapter 51, N.J.S.A. 19:44A-20.25, making its terms inapplicable where they would violate federal laws or regulations, or where they would prevent the State from complying with the provisions of the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 to -50. This proviso resulted from a conditional veto message of Acting Governor Codey, who had expressed concerns that Chapter 51, absent such a proviso, might jeopardize the State's receipt of federal transportation funds.[9]See Veto Message of Acting Governor Richard J. Codey with Regard to Assembly Bill No. 1500 (March 7, 2005).
With respect to timing, the Legislature endeavored within Chapter 51, at least in part, to accommodate EO 134's goal of accelerating the implementation of the pay-to-play restrictions. Specifically, all of the new provisions of Chapter 51 were declared retroactively effective as of October 15, 2004, the same effective date prescribed by EO 134. See N.J.S.A. 19:44A-20.13 to -20.25. The provisions of Chapter 19 amended by Chapter 51 retained their later (and prospective) effective date of January 1, 2006. See N.J.S.A. 19:44A-20.7 & -20.8. Chapter 51 also declared that "Executive Order No. 134 (2004) is hereby superseded." L. 2005, c. 51, § 17.

E.
The next revision to the pay-to-play laws occurred on January 5, 2006. On that date, L. 2005, c. 271 ("Chapter 271"), became effective. Chapter 271 provided that, notwithstanding the terms of Chapter 19, local governments could limit the award of public contracts in certain situations when a contractor bidding on or seeking that award had made a political contribution. N.J.S.A. 40A:11-51. Without *556 this amendatory statute, Chapter 19 arguably would have preempted local governmental units from adopting their own pay-to-play restrictions.
Chapter 271 also inserted additional requirements into the pay-to-play statutes. L. 2005, c. 271, §§ 2-3. These additions required bids on public contracts to include a list of reportable political contributions. N.J.S.A. 19:44A-20.26. They also required business entities making political contributions of $50,000 or more in a year to file an annual disclosure statement with the State Election Law Enforcement Commission ("ELEC"). N.J.S.A. 19:44A-20.27.

F.
Subsequently, on January 13, 2008, the Legislature enacted L. 2007, c. 304 ("Chapter 304"), amending both N.J.S.A. 19:44A-20.26 and -20.27. Chapter 304 was enacted to clarify N.J.S.A. 19:44A-20.26 and -20.27, so as to confine the definition of a business entity, for purposes of disclosure and reporting requirements of those sections, to a "for-profit entity." L. 2007, c. 304. Consequently, Chapter 304 exempts nonprofit organizations from the reporting and disclosure requirements of the pay-to-play statutes. Ibid.; see also S.B. 3025, 212th Leg. Sess. (2007) (Sponsor's Statement) (noting the purpose of the amendatory bill "to clarify" that the reporting and disclosure obligations of Chapter 51 apply only to "for-profit business entities" and "do not apply to nonprofit entities").

G.
On September 24, 2008, Governor Corzine signed both Executive Order 117 ("EO 117"), 40 N.J.R. 6251(a), and Executive Order 118 ("EO 118"), 40 N.J.R. 6252(a). These two orders further addressed pay-to-play issues.
Echoing the "for-profit" definitional qualifier that the Legislature had inserted through Chapter 304, EO 117 instructed Executive Branch agencies, in their enforcement of the pay-to-play laws, to construe the term "business entity" as being confined to "for-profit" enterprises. 40 N.J.R. 6251, ¶ 2. EO 117 further advised that a business entity encompasses, among other things, sole proprietorships and proprietors, as well as "any other form of entity organized under the laws of this State or any other state or foreign jurisdiction." Id. at 6251, ¶ 1(a). The order also extended the restrictions on political donations by spouses of contractors to their civil union partners. Id. at 6251, ¶ 1(a)(iv). Addressing the recent creation of the constitutional post of Lieutenant Governor, EO 117 stated that the pay-to-play laws respecting other Executive Branch departments and offices would similarly apply to contributions to the political campaign of a candidate for Lieutenant Governor. Id. at 6251, ¶ 4.
EO 118, meanwhile, extended the reach of the pay-to-play laws to contracts between a "State redevelopment entity" and "a redeveloper." 40 N.J.R. 6252-53. As noted in EO 118, such contracts consist of agreements between developers and those members of the Executive Branch, or groups designated by the Executive Branch, "to implement a redevelopment project and carry out a redevelopment plan." Id. at 6252, ¶ 1(c). In restricting political donations in that redevelopment context, EO 118 repeated the definition of a "business entity" set forth in EO 117. Id. at 6252, ¶ 1(a). It classifies a "redeveloper" as "any business entity that enters into or proposes to enter into a redevelopment agreement," including "a subsidiary business entity directly or indirectly controlled by the redeveloper," and business entities retained by a redeveloper "to perform professional, consulting, or lobbying *557 services in connection with the redevelopment project." Id. at 6252, ¶ 1(c).
Deploying, once again, procurement-related phraseology, EO 118 directed State redevelopment entities to "use a competitive process, to include public issuance of a request for proposal, a request for qualifications, or similar solicitation, for selecting a redeveloper." Id. at 6252, ¶ 2. It further mandated that "[e]very request for qualifications, request for proposals, or any similar solicitation issued by a State redevelopment entity ... shall contain ... a statement that compliance with this Order shall be a material term and condition of any redevelopment agreement with the State redevelopment entity and binding upon the parties[.]" Id. at 6253, ¶ 9.
As of this date, the Legislature has not enacted statutory provisions codifying the terms of EO 117 or EO 118. We are unaware of any litigation challenging the constitutional validity of those prior executive orders. Nor are we aware of any legal opinions requested from, or issued by, OLS opining on their validity.

H.
EO 7, the executive order of Governor Christie under review in the instant appeals, seeks to extend pay-to-play restrictions to labor unions and labor organizations. It attempts to do so by redefining the term "business entity" in this context to encompass "any Labor Union or Labor Organization which enters into contracts with the State of New Jersey and its instrumentalities or with other New Jersey public entities." 42 N.J.R. 580(b), ¶ 1. According to EO 7, "[p]rior Executive Orders implementing `pay-to-play' restrictions are hereby modified" to include such labor organizations. Ibid. Moreover, EO 7's reference to labor unions and labor organizations "shall include any political committee formed by any such labor union or labor organization, one of the purposes of which political committee is to make political contributions." Ibid. The order further recites in its second paragraph that "[p]rior Executive Orders implementing `pay-to-play' restrictions are hereby modified" to include certain legislative leadership committees.[10]Id. at 580, ¶ 2. The second paragraph does not refer to labor unions or labor organizations. Ibid.
In its preamble, EO 7 cross-references  and attempts to build upon  "prior actions of the New Jersey Legislature and existing Executive Orders[.]" Id. at 580. It observes that "since 2004, there have been a series of legislative and executive actions which have imposed restrictions on the campaign contributions of those who contract with the State of New Jersey and other public entities, so as to avoid actual conflicts of interest or even the appearance of conflicts of interest in the public contracting process[.]" Ibid. (emphasis added). The order acknowledges that those restrictions "have had a positive impact" upon what it again describes as "the public contracting process[.]" Even so, EO 7 finds that such restrictions "have not extended their reach to all `business entities' which contract with the State of New Jersey and other public entities[.]" Ibid.
Based upon these stated premises, EO 7 directs the Executive Branch to extend the State's pay-to-play restrictions to labor organizations and labor unions. In his brief, counsel for the Governor[11] explains that *558 the objective of the executive order is to place on "the same footing" both labor unions and private enterprises, both of which can exert significant influence through campaign donations upon public officials elected into office.
With regard to implementation, EO 7 directs all "Department and Agency heads" to "revise current regulations to be consistent with this change." Id. at 580, ¶¶ 1, 2. By its terms, the order took effect immediately, on January 20, 2010. Id. at 580, ¶ 3. As of the time of oral argument, no implementing regulations had been enacted.[12]

II.
On February 11, 2010, the New Jersey Education Association ("NJEA") requested that ELEC determine whether EO 7 applies to negotiated agreements with public employers. The NJEA is a nonprofit labor organization that represents over 200,000 professional and support staff employees of public schools in New Jersey. ELEC responded that the question should be referred to the Treasury Department. The Treasury Department did not respond to the NJEA's interpretative request prior to the filing of the present appeals.
Five days later, on February 16, 2010, OLS issued an opinion, concluding that EO 7 is unconstitutional because it impermissibly intrudes upon legislative powers.[13] The present litigation challenging the constitutionality of EO 7 promptly ensued.
On February 24, 2010, Communications Workers of America, AFL-CIO ("CWA"), New Jersey Public Employees, Council 1 of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Council 1"), the International Federation of Professional and Technical Employees, AFL-CIO, Local 195 ("Local 195"), and the American Federation of Teachers, AFL-CIO-New Jersey ("AFT") (collectively "appellants") jointly filed a notice of appeal, an emergent application for a stay and a motion to accelerate the appeal. A few days later, NJEA and the New Jersey State Policemen's Benevolent Association ("PBA") filed separate appeals, which we consolidated with the existing appeal. The appeals were properly filed with this court as a challenge to a final administrative decision or order, pursuant to Rule 2:2-3(a)(2). See also Bullet Hole, Inc. v. Dunbar, 335 N.J.Super. 562, 571-72, 763 A.2d 295 (App. Div.2000).
CWA represents 40,000 state employees organized into thirty-seven "locals," each of which has a legislative political action committee. CWA locals negotiate collective bargaining agreements with several counties and local government entities. *559 They also endorse political candidates in certain public elections. The umbrella organization, CWA, represents its members in various collective agreements with the State. It, too, contributes to political campaigns.
AFSCME Council 1, together with affiliated AFSCME councils 52, 71 and 73 and their locals (collectively, the "AFSCME councils"), represent approximately 10,000 state employees, as well as the employees of municipal and county agencies. The political action committee of the AFSCME councils makes contributions to the campaigns of legislators and other public officials who are perceived to support or favor the union members' interests.
Local 195 represents 7,000 state employees in operations, maintenance, services, and craft positions. Local 195 has a political action committee, which endorses candidates for office and which makes political contributions on behalf of its members.
AFT represents over 40,000 employees in public and private schools, libraries, and public universities. Each of AFT's three main constituent parts  Health Professionals and Allied Employees, the New Jersey State Federation of Teachers, and the Council of New Jersey State College Locals  is involved in political activities and makes contributions to political campaigns.
The PBA represents over 33,000 employees holding law enforcement positions with state, county, and municipal agencies. It represents 360 local PBAs, which each negotiate collective agreements on behalf of their members. The PBA endorses candidates at all levels of government, and contributes to political campaigns.[14]
Following our initial review of appellants' papers, we did not issue a stay or any other emergent relief, but instead arranged to have the matter briefed and argued on an accelerated basis.[15] The parties agree that the issues before us are purely legal, and that no fact-finding hearings are necessary.[16]
Appellants argue that EO 7 violates constitutional principles of separation of powers under article III, paragraph 1 of the New Jersey Constitution, by, in effect, amending and repealing existing statutes without legislative acquiescence. They maintain that our present New Jersey statutes, particularly those addressing the election of labor representatives and matters of collective bargaining, cannot be rationally harmonized with EO 7. They also contend that the intrinsic nature of a labor union is manifestly in conflict with the statutory definitions of a "business entity" specified by the Legislature in Chapter 19 and Chapter 51. Appellants further point to their constitutional rights to engage in collective negotiations pursuant to article *560 I, paragraph 19 of the State Constitution. Additionally, appellants contend that EO 7 violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as well as the freedom of speech and association provisions of the New Jersey Constitution, N.J. Const. art. I, ¶¶ 6 & 18.
In his defense of EO 7, the Governor maintains that it is a valid exercise of his authority over State contracts and State employees, in his capacity as the chief of the Executive Branch. He contends that EO 7 simply builds upon the precepts of EO 134, EO 117, and EO 118 to root out favoritism in public contracts, and that his order does not intrude upon legislative prerogatives any more than did the executive orders of his predecessors in office addressing pay-to-play issues. The Governor requests that, consistent with past tradition, this court accord substantial deference to the Executive Branch's constitutional role, and argues that EO 7 is thereby entitled to a presumption of validity. The Governor further submits that EO 7 is consonant with the First Amendment and with freedoms of political expression and association. Lastly, he maintains that the executive order does not violate any of the other constitutional provisions invoked by appellants.

III.

A.
We begin our analysis of the separation-of-powers issues with a recognition of the formidable executive authority vested in the Governor of New Jersey under the 1947 Constitution. In large measure, the 1947 Constitution strengthened the much more limited powers of the Governor that previously existed under the State Constitutions of 1776 and 1844. Kenny v. Byrne, 144 N.J.Super. 243, 250-51, 365 A.2d 211 (App.Div.1976), aff'd o.b., 75 N.J. 458, 383 A.2d 428 (1978) (noting that the framers of the 1947 Constitution intended to create a "strong executive"); see also Bullet Hole, supra, 335 N.J.Super. at 573, 763 A.2d 295.[17] Among other things, the Governor has the power to appoint cabinet members and State justices and judges, subject to the advice and consent of the Senate, N.J. Const. art. V, § 4, ¶¶ 2-3 and art. VI, § 6, ¶¶ 1, 3; investigate and discipline Executive Branch officials, id. art. V, § 4, ¶ 5; exercise a conditional veto over bills presented to him and direct their legislative reconsideration, id. art. V, § 1, ¶ 14(f); and excise line-item appropriations from the State budget, id. art. V, § 1, ¶ 15.
The key textual source for the Governor's constitutional authority over the Executive Branch of State Government appears in article V, section 1, paragraph 11:
The Governor shall take care that the laws be faithfully executed. To this end he shall have power, by appropriate action or proceeding in the courts brought in the name of the State, to enforce compliance with any constitutional or legislative mandate, or to restrain violation of any constitutional or legislative power or duty, by any officer, department or agency of the State; but this power shall not be construed to authorize any action or proceeding against the Legislature.
[N.J. Const. art. V, § 1, ¶ 11.]
*561 One optional method for the Governor to assure that the laws of this State are "faithfully executed" is to issue an executive order. Kenny, supra, 144 N.J.Super. at 251-52, 365 A.2d 211.
Executive orders, when issued within their appropriate constitutional scope, are an accepted tool of gubernatorial action. Bullet Hole, supra, 335 N.J.Super. at 574-75, 763 A.2d 295, see also Herman, supra, 30 Rutgers L.J. at 987 (noting the general constitutional authority for executive orders but also how the "[u]se of that tool raises political, legal, and constitutional questions"). As Chief Justice Vanderbilt observed in the seminal case of Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406, cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950), not long after the adoption of the 1947 Constitution:
[T]he Governor when he issues proclamations and exercises his ordinance power generally, [and] the administrative agencies when they exercise rule-making power[,] may seem to be exercising legislative power, but such powers, at least in the case of the Governor and the courts, are inherent and essential to the performance of the primary functions for which their offices are created in the Constitution.
[Id. at 252, 74 A.2d 406.]
The Legislature, too, possesses and exercises considerable institutional powers under our State constitutional framework. The Legislature's plenary law-making authority is reposed, by article IV, section 1, paragraph 1 of the State Constitution, in the State Senate and General Assembly. It includes, inter alia, the power to introduce legislation and to present bills upon their passage to the Governor, N.J. Const. art. IV, § 4 and art. V, § 1, ¶ 14(a); to raise revenue and appropriate funds, id. art. IV, § 6, ¶ 1; to confirm gubernatorial appointees; id. art. V, § 4, ¶ 2; and to override a Governor's veto by a two-thirds majority, id. art. V, § 1, ¶ 14(b)(3).
As the Supreme Court explained in Gangemi v. Berry, 25 N.J. 1, 8-9, 134 A.2d 1 (1957), by article IV, section 1, paragraph 1, "the people vested full sovereign authority in the Legislature, save as otherwise therein provided." See also Schmidt v. Bd. of Adj., Newark, 9 N.J. 405, 413, 88 A.2d 607 (1952). The Court further noted in Gangemi:
The theory of our political system is that the ultimate sovereignty is in the people, "from whom springs all legitimate authority"; and (1) the legislative authority in the States consists of "the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States," and the legislative department "is not made a special agency for the exercise of specifically defined legislative powers, but is [e]ntrusted with the general authority to make laws at discretion"; and (2) the apportionment to this department "of legislative power does not sanction the exercise of executive or judicial functions, except in those cases, warranted by parliamentary usage, where they are incidental, necessary, or proper to the exercise of legislative authority, or where the constitution itself, in specific cases, may expressly permit it." Cooley's Constitutional Limitations (8th ed.), 81, 175 et seq.; 180, note.
[Gangemi, supra, 25 N.J. at 9, 134 A.2d 1 (emphasis added).]
See generally Williams, supra, at 57-80 (discussing the facets and limitations of the Legislature's powers under Article IV and related provisions within the 1947 Constitution).
*562 The framers of the 1947 Constitution distributed powers among the three[18] branches of State Government in a fashion that recognizes both the need for, on the one hand, primacy and clarity of governmental functions, but also, on the other hand, the importance of inter-branch accommodation. In particular, article III, paragraph 1, the constitutional provision at the heart of the labor unions' core argument, instructs:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others except as expressly provided in this Constitution.

[N.J. Const. art. III, ¶ 1 (emphasis added).]
The concept of separation of powers, orperhaps more accurately statedthe distribution of powers, "is not an end in itself, but a general principle intended to ensure that the system of checks and balances remains vital." State v. Abbati, 99 N.J. 418, 434, 493 A.2d 513 (1985) (holding that a prosecutor's decision within the Executive Branch to re-prosecute a defendant is subject to review by the Judiciary). Although each branch within State government is delegated certain powers, these powers are not designed to be completely distinct and separate from each other. On the contrary, "[t]he separation of powers does not require complete insulation of the branches from each other." Gen. Assemb. v. Byrne, 90 N.J. 376, 382, 448 A.2d 438 (1982). The Constitution "`was never intended to create, and certainly never did create, utterly exclusive spheres of competence.'" Ibid. (quoting In re: Salaries for Prob. Officers, Bergen County, 58 N.J. 422, 425, 278 A.2d 417 (1971)).
Although a main objective of the separation-of-powers doctrine is to prevent the concentration of "unchecked power" in one branch of the government, David v. Vesta Co., 45 N.J. 301, 326, 212 A.2d 345 (1965), our courts have consistently recognized "that the doctrine requires not an absolute division of power but a cooperative accommodation among the three branches of government." Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 449, 617 A.2d 223 (1992). As our Supreme Court has wisely stated, "a rigid and inflexible classification of the branches of government into mutually-exclusive, water-tight compartments would `render government unworkable.'" Id. at 449-50, 617 A.2d 223 (quoting Massett Bldg. Co. v. Bennett, 4 N.J. 53, 57, 71 A.2d 327 (1950)). Naturally, it is inevitable that "some osmosis occurs when the branches touch one another; the powers of one branch sometimes take on the hue and characteristics of the powers of the others." Knight v. Margate, 86 N.J. 374, 388, 431 A.2d 833 (1981).
In some instances, a branch of government may delegate certain of its powers to another branch. See Commc'ns Workers *563 of Am., supra, 130 N.J. at 456, 617 A.2d 223 (dealing with gubernatorial implementation of employee layoffs). Or a branch may deliberately and definitively choose to share some of its power with another branch. See, e.g., In re Advisory Comm. on Prof'l Ethics Opinion 705, 192 N.J. 46, 58, 926 A.2d 839 (2007) (deferring to the Legislature regarding certain provisions of the New Jersey Conflicts of Interest Law). In such circumstances, the delegation or sharing of constitutional power ordinarily will be upheld. See, e.g., id. at 54, 926 A.2d 839; see also Cupano v. Gluck, 133 N.J. 225, 236, 627 A.2d 624 (1993) (holding that county prosecutors acting on behalf of the State had parallel authority with the legislatively-created ELEC to investigate election-law violations); Morss v. Forbes, 24 N.J. 341, 372-73, 132 A.2d 1 (1957) (holding that a legislative committee's subpoena of a prosecutor's wiretapping records did not violate separation of powers, given the Legislature's own delegated investigatory powers); State v. Bond, 365 N.J.Super. 430, 441-42, 839 A.2d 888 (App.Div.2003) (finding that the Legislature had properly enabled the Parole Board, an agency within the Executive Branch, to issue regulations concerning parolee supervision); Bullet Hole, supra, 335 N.J.Super. at 574-77, 763 A.2d 295 (finding that the Governor had been duly authorized by the Legislature, through a statute, to designate the State Police as a background checkpoint required under federal law for certain firearms).
Even so, "no deviation from ... the doctrine of the separation of powers will be tolerated which impairs the essential integrity of one of the great branches of government." Massett Bldg. Co., supra, 4 N.J. at 57, 71 A.2d 327 (emphasis added); see also Advisory Comm. on Prof'l Ethics, supra, 192 N.J. at 54, 926 A.2d 839; Commc'ns Workers of Am., supra, 130 N.J. at 449, 617 A.2d 223.
In contrast to situations where one branch of government willingly delegates powers to, or shares them with, another branch, fundamentally different issues arise under article III, paragraph 1, when one branch unilaterally exercises authority that has been reserved for another branch. Commc'ns Workers of Am., supra, 130 N.J. at 456, 617 A.2d 223. "[T]he taking of power is more prone to abuse and therefore warrants an especially careful scrutiny." Id. at 457, 617 A.2d 223. In such scenarios of unilateral aggrandizement, our courts have applied more stringent review. For example, in Communications Workers of America, supra, while striking down the Legislature's adoption of a statute that would have dictated to the Executive Branch certain layoff procedures and intra-branch resource allocations, the Supreme Court instructed:
Where cooperation between the branches is necessary to further the underlying substantive purposes of the legislative enactment, and where the cooperation offers no substantial potential for interference with the exclusive functions of the other branch, the mechanism for legislative involvement will not violate the separation-of-powers principle. But where shared authority is not necessary to effectuate the statutory scheme, or where the legislative intrusion threatens to interfere with exclusive functions of another branch, then the intrusion will violate the separation-of-powers principle.
[Id. at 460, 617 A.2d 223 (emphasis added).]
These core principles, safeguarding the "essential integrity" and "exclusive functions" of each branch of government, have been applied to cases such as this one, implicating the legitimacy of a Governor's *564 executive order. To be sure, in several of the limited instances where they have been challenged, the executive orders have been sustained as a valid exercise of the Governor's authority. See, e.g., Worthington v. Fauver, 88 N.J. 183, 440 A.2d 1128 (1982); Kenny, supra, 144 N.J.Super. at 243, 365 A.2d 211. That is particularly true in situations where, unlike the present case, the executive order flows out of the Governor's legislatively-delegated emergency powers to act on behalf of the safety and welfare of the people of New Jersey under the Disaster Control Act, N.J.S.A. App. A:9-30 to -63.[19]See, e.g., Worthington, supra, 88 N.J. at 183, 440 A.2d 1128 (regarding a crisis caused by the overcrowding of inmates within the State prisons). However, the Governor's invocation of such emergency authority is not boundless. See id. at 203-04, 440 A.2d 1128 (noting that the executive order would be invalid if it invokes the same emergency each year indefinitely).
In the absence of an emergency, an executive order must be based upon the furtherance of a legislative act or a constitutional mandate. Id. at 194, 440 A.2d 1128. An executive order is invalid if it usurps legislative authority by acting contrary to the express or implied will of the Legislature. Id. at 207, 440 A.2d 1128. Conversely, when the Governor is acting consistently with express or implied authority from the Legislature, his or her action should be given "`the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" Bullet Hole, supra, 335 N.J.Super. at 575, 763 A.2d 295 (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153, 1200 (1952)). By analogy, in Youngstown Sheet, where President Truman's executive order established federal possession of most of the nation's steel mills to avert a threatened strike and the attendant stoppage of steel production, the United States Supreme Court held that the President can only act pursuant to either a constitutional right or an act of Congress, and that presidential power cannot be implied from an "aggregate" of the President's Constitutional powers. Id. at 584-86, 72 S.Ct. at 866, 96 L.Ed. at 1166.
Although the judicial nullification of a gubernatorial executive order has been infrequent, there are some useful illustrations. For instance, in County of Gloucester v. State, 132 N.J. 141, 623 A.2d 763 (1993), our Supreme Court invalidated an executive order on prison overcrowding because it no longer qualified as a perennial "emergency" under the Disaster Control Act. Id. at 153, 623 A.2d 763. Nevertheless, the Court stayed the order's invalidation for a year, so as to allow for a legislative response to the persisting issue. Ibid.
In Williamson v. Treasurer, 357 N.J.Super. 253, 814 A.2d 1153 (App.Div.), certif. denied, 177 N.J. 493, 828 A.2d 920 (2003), we found a Governor's executive order inoperative, insofar as it unilaterally created an exemption from public disclosure of certain unclaimed property records in a manner inconsistent with the Right to Know Law, N.J.S.A. 47:1A-1. Williamson, supra, 357 N.J.Super. at 272, 814 A.2d 1153. In declining to enforce and apply the order, we noted that, "[s]imply put, an Executive Order cannot amend or repeal a statute." Ibid.; see also Twiss v. Dept. of Treasury, 239 N.J.Super. 342, 352, 571 A.2d 333 (App.Div.1990), rev'd on other grounds, 124 N.J. 461, 591 A.2d 913 (1991) (recognizing the same principle, although nullifying only a regulation issued by the *565 State Treasurer and not an executive order). However, we found it unnecessary in Williamson to declare the executive order invalid per se, as we construed its terms to be inapplicable to appellant's particular circumstances. Williamson, supra, 357 N.J.Super. at 273, 814 A.2d 1153.
As a further historical, if not precedential, example, in De Rose v. Byrne, 135 N.J.Super. 273, 343 A.2d 136 (Ch.Div.1975), the trial court nullified a Governor's executive order concerning membership on the bi-state Waterfront Commission. Id. at 288, 343 A.2d 136. The court held that the Governor could not convert the part-time position of De Rose, a designated New Jersey member of the Commission, to a full-time position that would be subject to conflict-of-interest rules governing such full-time employees. Ibid. The court reasoned that the executive order was invalid because it was not based on "an emergent situation," nor was it based upon "the furtherance of a legislative act or constitutional mandate." Ibid. (citing Youngstown Sheet, supra, 343 U.S. at 585, 72 S.Ct. at 866, 96 L.Ed. at 1166). After the Chancery Division issued its decision, Governor Byrne decided to allow De Rose to retain his part-time position on the Commission and waived the application of the constraints of the executive order to De Rose's current term. Consequently, this court vacated the Chancery Division's decision as moot. De Rose v. Byrne, 139 N.J.Super. 132, 133-34, 353 A.2d 100 (App. Div.1976).
The Governor asserts that EO 7 comports with these established precepts of separation of powers. Before evaluating that assertion, we must examine one more subject: the existing law of New Jersey respecting public-sector employees, labor organizations, and collective negotiations.

B.
Under N.J. Const. article I, paragraph 19, "[p]ersons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing." Ibid. (emphasis added). As noted by our Supreme Court, "[t]he parameters of collective negotiations about such proposals were established in 1968 by the New Jersey Employer-Employee Relations Act [(`EERA')], N.J.S.A. 34:13A-1 to -21, and later by judicial decisions." In re Local 195, IFPTE, AFL-CIO v. State, 88 N.J. 393, 401, 443 A.2d 187 (1982).
The Court has acknowledged that "the phrase `representatives of their own choosing' [within article I, paragraph 19] has become a phrase of art, designed to convey the intention that the employees' selection of a bargaining representative should be an uncoerced and free choice." Lullo v. Int'l Assoc. of Fire Fighters, 55 N.J. 409, 422, 262 A.2d 681 (1970). The Court determined that the framers of the 1947 Constitution would have been familiar with this usage, as it derives from the wording of the National Labor Relations Act, 29 U.S.C.A. § 157, which was enacted in 1935. Lullo, supra, 55 N.J. at 422-23, 262 A.2d 681.
Under the EERA, the designated union representative of a majority of public employees is chosen by those employees alone. N.J.S.A. 34:13A-5.3. Once chosen, the State is required to negotiate in good faith with that representative. Ibid. The statute establishes the Public Employment Relations Commission ("PERC"), an agency which has the authority and duty to "make policy and establish rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures *566 and administration including enforcement of statutory provisions concerning representative elections and related matters and to implement fully all the provisions of [the EERA]." N.J.S.A. 34:13A-5.2.
Pursuant to its statutory authority, PERC has promulgated numerous regulations. Among other things, the regulations specify the methods for certification and decertification of a union representative. Both certification and decertification require a "showing of interest" by the employees in the bargaining unit, surpassing a thirty percent threshold. N.J.A.C. 19:11-1.2(a)(9) (regarding certification); N.J.A.C. 19:11-1.3(a)(3) (regarding decertification). A public employee or group of public employees may file the initial petition for certification with PERC. N.J.A.C. 19:11-1.1(a)(1). Similarly, a petition may be filed by "any individual or employee organization claiming to be the exclusive representative of public employees." Ibid.
A public employer may also file a petition for certification on behalf of its employees. N.J.A.C. 19:11-1.1(a)(2). In order for a petition for certification to be accepted by PERC from the public employer, such as the State, that petition must "state that a claim for representation or continued representation has been made by one or more public employees, groups of public employees, individuals or employee organizations and that the public employer has a good faith doubt concerning the majority status of the representative of its employees." N.J.A.C. 19:11-1.4.
Only a "public employee or group of public employees or any individual acting on their behalf" may file a petition for decertification. N.J.A.C. 19:11-1.1(a)(3). Such a petition must detail the petitioner's allegations that the current representative "is no longer the majority representative of such employees and that the employees no longer desire to be represented by any employee representative." Ibid. A public employer may not file a petition for decertification. Ibid. Therefore, although the EERA does not expressly detail the process for the removal of a duly-selected labor organization, the administrative regulations delineate that procedure.
We recognize, as appellants' counsel acknowledged at oral argument, that it is conceivable that a union chosen by a majority of employees and certified by PERC might be thereafter declared ineligible, as a matter of law, to continue to represent the employees in a bargaining unit for reasons of criminal conduct or other wrongdoing. No present statutes or regulations in our State appear to address the process for such an ouster arising out of criminality or wrongdoing, apart from the decertification procedures administered by PERC.[20]
On the whole, these interconnected provisions in the State Constitution, the EERA, and the PERC regulations signify that certifying and decertifying a majority representative in the public sector is accomplished through mechanisms that carry out the "uncoerced and free choice" of the *567 represented employees. Lullo, supra, 55 N.J. at 423, 262 A.2d 681. There is a well-developed body of law and an administrative scheme in place to regulate the selection and displacement of the employees' chosen majority representatives.
Once in place, a majority representative is authorized to engage in collective negotiations with the public employer. N.J.S.A. 34:13A-5.3. The negotiations are designed to produce a collective bargaining agreement with the employer, reciting the terms and conditions of the employees' compensation, disciplinary practices, and other matters affecting the workplace. The negotiations are bilateral interactions between the employer and the union, and, unlike many contracts for goods and services, there can be no "competitive bidding" or participation of third party competitors. Mount Holly Twp. Bd. of Educ. v. Mount Holly Twp. Educ. Ass'n, 199 N.J. 319, 327-29, 972 A.2d 387 (2009). When the terms of an agreement cannot be reached, issues may be referred to an arbitrator for resolution. N.J.S.A. 34:13A-7.
These fundamental aspects of a public employee union's selection and function, and the distinctive genesis and nature of a collective bargaining agreement, bear significantly upon our analysis of EO 7's compatibility with existing laws and statutes. We now turn to that analysis.

C.
By its stated terms, EO 7 attempts to broaden the definition of "business entity" under the pay-to-play laws to encompass "labor unions and labor organizations." The executive order does not refer to collective bargaining or to collective negotiations. However, the Governor's attorney confirmed, both in his brief and at oral argument, that EO 7 was intended to include such collective labor agreements within its scope.[21] According to the Governor, EO 7 is intended to require Executive Branch agencies and departments to treat collective bargaining agreements as another form of "contract" subject to the pay-to-play laws.
The Governor and the amicus forcefully argue that there are strong public policies to eradicate improper influences, or even the appearance of such influences, arising out of political campaign contributions made by labor organizations. They assert that taxpayers and the public at large can be disadvantaged when labor organizations contribute generously to political candidates who are in or who assume State office, and who then participate in collective negotiations with those same unions. The concern is that State office-holders, having personally benefited from the largesse of a union during the campaign, will be apt to treat the union members generously at the bargaining table during the next round of collective negotiations.
We do not minimize or reject these stated public policy concerns, although we likewise recognize the unions' claim that those concerns are either mistaken or overstated. It is not our function as a court to referee the merits of that important public policy debate. Instead, we are tasked with the discrete but important responsibility of determining whether the method selected for implementing the new public policy, i.e., Executive Order 7, comports with the Constitution, and, in *568 particular, the doctrine of separation of powers.
In a host of respects, the terms of EO 7, if applied to collective bargaining agreements, do not mesh with existing statutes and laws governing public employee relations. EO 7's attempted extension to labor unions and to collective negotiations also does not fit neatly within the structure of existing pay-to-play statutes codified by the Legislature in Chapters 19 and 51. Nor, if relevant, is EO 7 of the same species as the executive orders on pay-to-play issues that preceded it.
As our previous discussion in Part I, supra, has shown, the structure and verbiage of the pay-to-play restrictions codified by the Legislature in Chapters 19 and 51, N.J.S.A. 19:44A-20.3 to -22as well as in (now-superseded) EO 134 and in EO 117 and EO 118are replete with terms associated with public bidding and with the procurement of lands, buildings, goods, and services. They repeatedly allude, not only to procurement itself, but to an assortment of procurement-related concepts such as contract "bidders," "bid applications," "specifications," "awards," "purchasing agents or agencies," "bid or price quote," "material terms," and "breach" in a competitive marketplace. This terminology is consistent throughout those measures and cannot be accidental. The measures are plainly targeted against undue influence by political contributors within the domain that is conventionally known as the procurement of government contracts.
In construing the words of a statute or other legal provision, we routinely apply the ordinary meaning ascribed to those words. Soto v. Scaringelli, 189 N.J. 558, 570, 917 A.2d 734 (2007). The widely-accepted understanding of the term "procurement" does not encompass collective bargaining agreements between a public employer and a labor union representing public workers. See, e.g., Webster's II New College Dictionary 882 (1999) (defining "procurement" as the noun version of "procure," meaning "to obtain: acquire."); see also Fennimore v. Clementon Sewerage Auth., 173 N.J.Super. 466, 470-71, 414 A.2d 593 (App.Div.1980) (declining to apply the Local Public Contracts Law, N.J.S.A. 40A:11-1 to -51, to employment agreements, because doing so would violate "common sense" and would also constitute "a wholly unwarranted and legislatively unintended interference with, if not potential abrogation of, the [EERA]").[22] Moreover, labor unions, unlike vendors of goods and services selected under the public bidding laws, never have to be selected based upon considerations of merit or cost.
The special characteristics of a labor union and a labor organization do not square with the definition of a "business entity" set forth by the Legislature in N.J.S.A. 19:44A-20.7 (Chapter 19) and in N.J.S.A. 19:44A-20.17 (Chapter 51), the existing pay-to-play statutes. As we have noted, both of those statutory definitions classify a business entity to mean "any natural or legal person, business corporation, professional services corporation, limited liability company, partnership, limited partnership, business trust, association or any other legal commercial entity organized under the laws of this State or any other state or foreign jurisdiction." N.J.S.A. 19:44A-20.7 & -20.17.
To be sure, a labor union literally is a "legal person" and a form of "association." But a union is not the same sort of *569 person or association that is anything like the other examples set forth within the statutory definition. The catchall phrase at the end of the definition, "any other legal commercial entity organized under the laws of this State or any other state or foreign jurisdiction[,]" notably contains the adjective "commercial", which signifies an enterprise that is organized for entrepreneurial purposes. (emphasis added). Webster's defines "commercial" as "[o]f or relating to commerce" and "[e]ngaged in commerce." Webster's II, supra, 225. Furthermore, "commerce" is defined as "the buying and selling of goods, esp[ecially] on a large scale." Ibid.; see also Broadwell Realty Servs., Inc. v. The Fid. & Cas. Co. of N.Y., 218 N.J.Super. 516, 527, 528 A.2d 76 (App.Div.1987) (recognizing the propriety of courts resorting to dictionaries when considering the common meaning of statutory terms), overruled on other grounds by Morton Int'l v. Gen. Accident Ins. Co., 134 N.J. 1, 28, 629 A.2d 831 (1993).
A labor organization is not organized for the commercial profit of the organization itself. Unlike a business, it is commonly organized under Section 501(c)(5) of the Internal Revenue Code, 26 U.S.C.A. § 501(c)(5). Moreover, the statutory references to "profits," "stock," and "assets" in defining a person's "interest" in a business entity, see N.J.S.A. 19:44A-20.7, do not logically apply to labor unions. Unions are not established as profit-seeking ventures. Rather, they are created to further their members' interests in maximizing wages and benefits, while, at the same time, advocating for workplace safety.
The statute's catchall reference to "any other legal commercial entity" follows an illustrative list of enumerated entities within the definition of a "business entity." That illustrative list includes traditional for-profit entities such as corporations, partnerships, and limited liability companies. Under the basic principle of statutory construction, ejusdem generis, the general words following specific words should be construed to embrace only objects that are similar in nature. Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 367-68, 924 A.2d 447 (2007); State v. Hoffman, 149 N.J. 564, 584, 695 A.2d 236 (1997) (citing 2A Norman J. Singer, Sutherland Statutory Construction § 47.17 (5th ed. 1992)). A labor organization, particularly in this overarching procurement context, is not a "similar object" to a corporation, partnership, or other commercial enterprise.
The 2007 amendment to the pay-to-play statutes' reporting and disclosure requirements, Chapter 304, inserted the prefatory language, a "for-profit entity that is ..." immediately before the statute's definition of business entity. L. 2007, c. 304 (emphasis added); N.J.S.A. 19:44A-20.26, -20.27. This insertion underscores the commercial focus of the existing pay-to-play laws. Chapter 304 also makes it unmistakably clear that nonprofit organizations are outside the scope of what the Legislature meant by a "business entity." We are mindful that the Legislature did not simultaneously make similar clarifying revisions in 2007 to the definitions of business entity in N.J.S.A. 19:44A-20.7 and -20.17. However, the legislative history reflects that the impetus of the 2007 amendment was to spare nonprofits the burden of filing annual reports with ELEC under the pay-to-play laws, a compliance issue that had been the particular subject of regulatory concern.[23]
*570 Moreover, the remedial aspects of Chapters 19 and 51 are not reasonably compatible with a mechanistic injection of the terms "labor organization" and "labor union" within the four corners of the existing pay-to-play statutes. Since labor organizations are not-for-profit entities, they are statutorily excluded by N.J.S.A. 19:44A-20.26 and -20.27 from the pay-to-play statute's disclosure and reporting requirements. That exclusion would substantially weaken the effort to subject collective negotiations to the pay-to-play laws. That is because a labor union's past political contributions would not readily be made known, at least not without some form of independent research, to the public agency engaged in bargaining with that union and to the public at large.
Also, quantifying the "value of the transaction" for purposes of the statutory $17,500 threshold triggering the pay-to-play restrictions, see N.J.S.A. 19:44A-20.14, is problematic when applied to the State's relationship as employer with a labor organization representing State employees. A collective bargaining agreement is not ordinarily referred to as a "transaction," although we acknowledge that the word "transaction" could have sufficient breadth of meaning to cover such negotiated agreements. Even so, it is not certain whether the "value" to be measured under the law, if EO 7 were upheld, would be the portion of the State's payroll disbursed to the represented employees or whether, as the Governor's counsel suggested at oral argument, the "value" would be measured by the labor organization's receipt of union dues from its members. Although these alternative approaches are likely to yield values exceeding $17,500, the valuation terminology within the statute does not readily fit the union's distinctive role.
In addition, we have great difficulty in sensibly applying, in the unique context of a collective bargaining agreement, the legislative declaration of N.J.S.A. 19:44A-20.21, stating that a violation of the pay-to-play laws "shall be a breach of the terms of the government contract" with the business entity. (emphasis added). Even if we were to apply the notion of a breach, a term more commonly found in a traditional contract setting, in the collective bargaining context, it is unclear how a violation of EO 7 comprising such a breach would be remedied.
For example, it is not clear if EO 7 is meant to require the ouster or decertification of the labor union that made the prohibited campaign donation. If so, that ouster would implicate, and would likely directly clash with, the constitutional and statutory right of public employees to be represented by the union approved by a majority vote of its members. The intended timing and conditions of the ouster, and its effect upon existing collective bargaining agreements, also are murky at best. This is not a minor detail that can be left to a future administrative regulation. Instead, such an ouster or decertification would strike at the core of our collective bargaining system embedded in pre-existing statutes.
"`In discerning [the Legislature's] intent, [courts] consider not only the particular statute in question, but also the entire legislative scheme of which it is a part.'" In re Adoption of a Child by W.P. and M.P., 163 N.J. 158, 168, 748 A.2d 515 (2000) (quoting Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 234, 708 A.2d 401 *571 (1998)). Here, the Legislature's self-evident omission of labor organizations and collective bargaining agreements from the extant pay-to-play statutes in Chapters 19 and 51 in Title 19 is compatible with the "entire legislative scheme" in Title 34 regulating labor organizations under the EERA. By contrast, EO 7 lacks such manifest compatibility.
The Legislature clearly knew how to define and include labor organizations when it wanted them encompassed by the campaign contribution laws. By way of illustration, N.J.S.A. 19:44A-11.3 and -11.4, the statutes that impose general limits on political campaign contributions, include several explicit prohibitions that broadly and unambiguously sweep in labor unions. As we noted in Part I, supra, those statutes, which are codified in the statutory provisions immediately before the pay-to-play provisions of Chapters 19 and 51, instruct that "no labor organization of any kind which exists or is constituted for the purpose, in whole or in part, of collective bargaining, or of dealing with employers concerning the grievances, terms or conditions of employment, or of other mutual aid or protection in connection with employment" may make campaign donations above the prescribed limits of that section. See N.J.S.A. 19:44A-11.3(a); see also N.J.S.A. 19:44A-11.4(a)(1), (b), & (c) (utilizing the same definition).
When the Legislature wanted to include labor organizations in a statute, it consciously chose the words to do so. Its omission of equivalent references to labor organizations in Chapters 19 and 51 is, by comparison, conspicuous and instructive.
Careful examination shows that a revision of the pay-to-play laws to encompass labor organizations and collective bargaining agreements would necessitate substantial amendments and modifications to existing statutes, including, but not limited to, EERA, as well as to certain aspects of Chapters 19 and 51. The desired changes in the law would, in essence, require not only a pen, but also an eraser. Given the statutes already on the books, an executive order cannot unilaterally mandate the de facto decertification of a labor union as the designated representative of public employees, at least not without implementing many other statutory modifications.
We are not, by any means, concluding that what the Governor seeks to accomplish is illegal, impossible, or unwise public policy. At oral argument, counsel for the unions acknowledged that an appropriate statute potentially could be enacted to create, subject to other constitutional constraints, the functional equivalent of pay-to-play restrictions for labor organizations. But such a new statute necessarily would require a significant overhaul of existing laws. The Legislature, given its constitutionally delegated realm of authority, would have to be part of that law-making process. See N.J. Const. art. V, § 1, ¶ 14(a) (the Presentment Clause). We cannot accord deference to EO 7's unilateral attempt to exercise the Legislature's powers, where the Legislature has not ceded those powers to the Executive. Commc'ns Workers of Am., supra, 130 N.J. at 463, 617 A.2d 223.
An executive order cannot bypass the Legislature and carry out what would be, in effect, an implied repealer of existing legislation. "A repeal by implication requires clear and compelling evidence of legislative intent, and such intent must be free from reasonable doubt." Twp. of Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268, 280, 486 A.2d 818 (1985). A strong presumption against an implied repealer exists, and "[e]very reasonable statutory construction should be applied to avoid finding [it]." Id. at 281, 486 A.2d 818. To the extent that it aims *572 to dramatically alter the existing and comprehensive statutory scheme for collective bargaining, EO 7 cannot substitute for an appropriate repealing statute duly enacted by the Legislature and signed into law (absent a veto override) by the Governor.[24]
The constitutionality of EO 7 is not bolstered by the issuance of prior executive orders by Governors McGreevey and Corzine. Those prior orders were aimed at traditional procurement and public contracting, not collective negotiations. EO 7 is of an entirely different stripe. It alters the definition of a "business entity" in a manner fundamentally different from what was pursued in EO 134, EO 117, and EO 118. Moreover, none of those prior executive orders was ever challenged or upheld in court.[25] When such a challenge was anticipated respecting EO 134, the Legislature quickly preempted that possibility by enacting Chapter 51 and by superseding EO 134. Indeed, the Legislature's rapid enactment of Chapter 51 is a further indication that it has not abdicated its constitutional role over these subject matters.
We have considered whether, as one of appellants' counsel has suggested, a "savings construction" of EO 7 should be adopted, one which interprets EO 7 to apply only to the rare or hypothetical instance in which a procurement contract for goods and services is awarded to a labor organization. At oral argument we were informed that such minor contracts are occasionally awarded to labor organizations undertaking certain training activities on behalf of the State. None of the appellants is aware of any such procurement contracts now in existence involving their particular unions. The Governor's counsel, meanwhile, submits that EO 7 was not issued to apply only to such minor and rare situations. A grand initiative is not saved by shrinking it to an inconsequential afterthought.
Given the reality of the circumstances, we choose not to construe EO 7 in a constrictive and artificial manner. Instead, we shall read it in a fashion consistent with its announced and apparent policy objectives. Such a faithful reading cannot be reasonably harmonized with existing statutes and laws.
The prospective adoption of regulations implementing EO 7 will not cure these many problems. It is well settled that administrative regulations adopted by the Executive Branch cannot amend or repeal statutes. Accident Index Bureau, Inc. v. Hughes, 46 N.J. 160, 165-66, 215 A.2d 529 (1965); Twiss, supra, 239 N.J.Super. at 352-53, 571 A.2d 333. Consequently, there is no reason for the court to await such regulations before making a definitive ruling on the separation-of-powers issues.
This is not the first time that the Constitution has mandated the nullification of an executive order. Nor is it the first time that a governmental branch has engaged in institutional encroachment. In Communications Workers of America, supra, the Legislature was found to have overstepped its bounds by encroaching upon the powers of the Executive. See Commc'ns Workers *573 of Am., supra, 130 N.J. at 463, 617 A.2d 223. Here, the Executive has encroached upon the powers of the Legislature. In both instances, the Constitution must prevail, while still providing ample opportunity for future inter-branch accommodation. The pursuit of expanding pay-to-play reforms to include labor unions need not cease today. Rather, that pursuit, if desired, may continue through collaborative endeavors.
In sum, we conclude that paragraph 1 of EO 7, at least insofar as it is intended to treat collective bargaining agreements as "contracts" and labor unions as "business entities," is so fundamentally incompatible with our existing laws and statutes as to impair the "essential integrity" of the constitutional powers of the Legislature. Massett Bldg. Co., supra, 4 N.J. at 57-59, 71 A.2d 327.
We do not reach this conclusion lightly. Nor do we otherwise discount or question the Governor's policy objectives or his considerable and well-established constitutional authority over the Executive Branch and the management of the State workforce. We simply hold that what EO 7 seeks to achieve must be pursued through legislation.[26]

IV.
Having concluded that paragraph 1 of EO 7 violates the separation-of-powers doctrine, we need not decide the other constitutional issues presented by appellants. Randolph Town Ctr., L.P. v. County of Morris, 186 N.J. 78, 80, 891 A.2d 1202 (2006) (applying the well-recognized maxim that "[c]ourts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation"). With respect to the First Amendment and free speech infringement claims raised by appellantsand without definitively deciding those issues herewe refer to Earle Asphalt, supra, 401 N.J.Super. at 319-25, 950 A.2d 918, in which we sustained the constitutional validity of Chapter 51, in ruling upon an arguably-similar First Amendment and free speech challenge. Cf. Citizens United v. Fed. Election Comm'n, 558 U.S. ___, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

V.
For all of these reasons, paragraph 1 of Executive Order 7 is hereby vacated as exceeding executive power. In the interests of accommodating potential review by the Supreme Court, our determination shall be effective July 1, 2010, unless the Governor files a timely notice of appeal or petition for certification, in which event the effective date shall be stayed pending further order of the Supreme Court.
NOTES
[1] We shall use the terms "collective bargaining" and "collective negotiations" in this opinion interchangeably.
[2] For a more comprehensive historical overview of the development of our State's pay-to-play enactments through 2008, see Kevin Weber, Comment, Unsuccessful Campaign Finance Reform: The Failure of New Jersey's 2004-2005 Pay-to-Play Reforms to Curb Corruption and the Appearance of Corruption, 38 Seton Hall L.Rev. 1443, 1449-68 (2008).
[3] Although we need not describe them exhaustively or with great precision, the present ceilings appear to be $2,600 per election for donations to certain specified political candidates or their respective campaign committees, N.J.S.A. 19:44A-11.3(a)(1)-(3); $25,000 per year for donations to certain specified State political party committees, legislative leadership committees, and joint candidates committees, N.J.S.A. 19:44A-11.4(a)(1); $37,000 per year for donations to certain specified county political party committees, N.J.S.A. 19:44A-11.4(b); and $7,200 per year for donations to certain specified municipal party committees, N.J.S.A. 19:44A-11.4(c). It is undisputed that these maximum contribution limits are well above the $300 threshold for the reporting of contributions. See N.J.S.A. 19:44A-8(d). It is also undisputed that the $300 reporting threshold, which is adopted by reference as a contribution limit within the pay-to-play statutes, is far below the donation limits that otherwise would pertain. See N.J.S.A. 19:44A-20.3 (restricting certain contracts with legislative branch agencies by business entities that make political contributions at levels "reportable by the recipient" under Chapter 83); N.J.S.A. 19:44A-20.16 (defining a "contribution," for purposes of pay-to-play restrictions involving Executive Branch contractors, as a sum "reportable by the recipient under `The New Jersey Campaign Contributions and Expenditures Reporting Act', [L.] 1973, c. 83").
[4] Originally, the maximum political contribution could not exceed $200, but that amount was later amended to $300. See L. 2004, c. 28, § 3 (amending N.J.S.A. 19:44A-8(d)).
[5] For a detailed comparison of various differences between EO 134 and Chapter 19, see Steven H. Sholk, A Guide To New Jersey Corporate Political Action Committees After the 2004 Campaign Finance Legislation and Executive Order, 29 Seton Hall Legis. J. 11, 32-39 (2004) (describing various differences between L. 2004, c. 19, and EO 134).
[6] To the best of our knowledge, EO 134 was never challenged in litigation.
[7] One notable variation is that, unlike EO 134  in which Governor McGreevey stated that, "as Governor, I must safeguard the integrity of State government procurement by imposing [pay-to-play] restrictions"  Chapter 51 substitutes "the Legislature" as the guardian of public integrity empowered to impose such legal obligations. Compare 36 N.J.R. at 4563 (emphasis added) with N.J.S.A. 19:44A-20.13 (emphasis added). Chapter 51 also omits language from EO 134 in which the former Governor stated that "the Constitution of this State requires me, as Governor, to manage the operations of State government effectively and fairly," instead converting that finding to a passive-voice sentence that does not invoke the Governor's individual authority. Compare 36 N.J.R. at 4563 (emphasis added) with N.J.S.A. 19:44A-20.13 ("The operations of the State government must be effectively and fairly managed to ensure public order and prosperity, and malfeasance, in whatever form it may take, must be confronted and uprooted." (emphasis added)). These verbal alterations, minor as they may seem at first blush, bespeak the Legislature's institutional concern about preserving its primary law-making powers.
[8] The "fair and open process" exemption continues in force for county and municipal contracts, and for contracts with a State agency in the Legislative Branch. N.J.S.A. 19:44A-20.3, -20.4, & -20.5.
[9] The concern was not hypothetical, as in January 2005 the Federal Highway Transportation Authority ("FHTA") withheld $250 million in funding from New Jersey, upon concluding that EO 134 was in conflict with federal highway funding and procurement laws. See Executive Order 18, 37 N.J.R. 693(a) (Mar. 7, 2005) ("EO 18") (making EO 134 inapplicable to contracts funded by FHTA funds). The parties have not questioned or discussed EO 18 in their briefs and arguments.
[10] This aspect of EO 7 concerning legislative leadership committees has not been challenged in the present appeals, and we do not pass on its validity.
[11] As reflected by the caption, the Governor is represented, as the sole respondent in these appeals, by private counsel. The Attorney General was given due notice of the appeals, which involve the constitutionality of a State enactment, see Rule 2:5-1(h), and, at this court's direction, was served with copies of appellants' papers. Although the Attorney General's Office initially secured an extension of time for the filing of the Governor's responding brief, the Attorney General has not otherwise participated in the appeals, nor was she obligated to do so.
[12] Based upon our colloquy with counsel at oral argument, we gather that the adoption of regulations has been voluntarily deferred, pending our decision on the constitutional validity of the Executive Order. We do not fault the Executive Branch for awaiting the outcome of this case before publishing such proposed regulations for public notice and comment.
[13] We neither give special deference to the OLS opinion, nor do we disregard it. We are mindful that no current member of the Legislature has intervened in this matter, and that the legal opinion of OLS may not necessarily reflect the views of the entire legislative body. See N.J.S.A. 52:11-58(b)(1)-(5) (outlining OLS's bipartisan functions, including the provision of legal advice to the Legislature upon request).
[14] Apart from these named parties, we granted a motion by a former legislator, John W. Hartmann, Esq., to appear as amicus curiae and file a brief. He did not request leave to appear at oral argument, and the points in his brief were substantially coextensive with those of the Governor.
[15] The initially-perceived urgency of these appeals was related to school board and school budget elections that were to be conducted in April 2010 and upcoming municipal elections in May 2010. However, the parties subsequently acknowledged to us at oral argument that the urgency of the situation was abated by the Governor's counsel's concession at oral argument that EO 7 does not apply, and was not intended to apply, to contributions made in connection with county, municipal, or school board elections. In addition, it was represented to us at oral argument that there are no statewide offices or legislative races presently contemplated for the November 2010 General Election.
[16] This opinion disposes of all open motions in the appeals.
[17] See generally Robert F. Williams, The New Jersey State Constitution: A Reference Guide 81-93 (1997) (tracing and enumerating the Governor's powers respectively under the 1776, 1844 and 1947 Constitutions); see also Michael S. Herman, Gubernatorial Executive Orders, 30 Rutgers L.J. 987, 987 (1999) (observing that "[t]he powers that the Governor exercises today under the Constitution of 1947 are radically different from the powers that were held by New Jersey's first Governor").
[18] Given the particular context of this case involving a perceived clash between the Executive and Legislative Branches, we need not comment about the Judiciary's own constitutional authority, as conferred under Article VI of the Constitution, see generally Williams, supra, at 94-104, as the parties accept this court's responsibility to interpret the laws of this State, and to rule upon the constitutional and legal issues presented to us. See, e.g., Karcher v. Kean, 97 N.J. 483, 479 A.2d 403 (1984) (reviewing the constitutionality of the Governor's exercise of line-item veto authority); In re Zicarelli, 55 N.J. 249, 261 A.2d 129 (1970) (reviewing the constitutionality of the Legislature's creation of a State Commission on Investigation); see also N.J. Const. art. VI, §§ 2, 3 (providing for the appellate jurisdiction of the Supreme Court and Superior Court, respectively).
[19] We note that EO 7 does not invoke the Governor's powers under the Disaster Control Act, and makes no finding of a public emergency.
[20] By analogy, under the NLRA, "[t]he authority of a union duly designated or selected as a bargaining agent can be terminated only by the agreement of the parties or by operation of law." E.H. Schopler, Continuance or Termination of Labor Union's Status or Authority as Bargaining Agent, 42 A.L.R.2d 1415 (2010); see also NLRB v. Scullin Steel Co., 161 F.2d 143 (8th Cir.1947). For example, there have been federal cases where a trustee has been appointed to manage the union's affairs in lieu of union leaders who have committed crimes. See, e.g., United States v. Local 560 (I.B.T.), 974 F.2d 315, 336 (3d Cir.1992); United States v. Int'l Brotherhood of Teamsters, 941 F.2d 1292, 1294 (2d Cir.1991), cert. denied sub nom., Senese v. United States, 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).
[21] We again note the Governor's acknowledgment that EO 7 is intended only to cover State departments and agencies in the Executive Branch, and not counties, municipalities, or school districts.
[22] "The law of public procurement is concerned with the rights and liabilities of successful or unsuccessful bidders or proposers who are making government contracts, their performance of the contracts, remedies during and after the performance, and the innumerable related subjects which may arise out of individual procurements." W. Noel Keyes, Government Contracts Under the Federal Acquisition Regulation 19 (3d ed. 2003).
[23] On April 6, 2006, ELEC adopted rules which specifically required compliance with disclosure rules from both for-profit and non-profit entities. 38 N.J.R. 1864(a), 1867. In order to bring its regulations into compliance with the statute, ELEC amended N.J.A.C. 19:25-26.1 to define "[b]usiness entity" as a "for-profit entity," effective April 19, 2010. 42 N.J.R. 811(a), 820.
[24] We need not comment on the two 1998 advisory opinions of the School Ethics Commission cited by the Governor, opinions which address the potential disqualifying effects of political contributions and political campaigning upon school board appointments under the School Ethics Act, N.J.S.A. 18A:12-21 to -34. The School Ethics Act is not implicated by EO 7, which the Governor's counsel acknowledges does not pertain to school board elections. We also point out that the cited advisory opinions did not consider the EERA, nor did they consider the Legislature's ensuing adoption of Chapters 19 and 51.
[25] We do not offer any advisory opinion concerning the validity of EO 117 and EO 118, and this opinion solely concerning EO 7 should not be construed as such.
[26] We do not speculate here, of course, about the permissible contours of such legislation or whether it would pass muster under constitutional requirements.